# Illinois Official Reports

## Appellate Court

---

### *In re Zoey L.*, 2021 IL App (1st) 210063

---

| | |
|---|---|
| Appellate Court Caption | *In re* ZOEY L., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Alan L., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>No. 1-21-0063 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | July 30, 2021<br><br>August 27, 2021<br>August 27, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-JA-741; the Hon. Patrick T. Murphy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Sharone R. Mitchell Jr., Public Defender, of Chicago (James Stephens Jacobs, Assistant Public Defender, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Christopher J. Williams, of counsel), guardian *ad litem*. |

Panel	JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1 This case arises out of the State's petition for temporary custody and adjudication of wardship over one-year-old Zoey L. At an adjudicatory hearing, the circuit court of Cook County found that Zoey was neglected due to an injurious environment and at substantial risk of physical injury. Two months later, the court held a dispositional hearing, at the conclusion of which it placed Zoey in the custody of the Department of Children and Family Services (DCFS) guardianship administrator. Respondent Alan L., Zoey's father, filed a motion to vacate the dispositional order, which was denied. Alan now appeals the trial court's adjudicatory and dispositional orders, contending that they are contrary to the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2 BACKGROUND

¶ 3 Alan is the father of minor Zoey, who was born in September 2018. Zoey's mother is Tiffany C., who participated in the circuit court proceedings but is not a party to this appeal.

¶ 4 On July 12, 2019, the State petitioned for adjudication of wardship and temporary custody of Zoey alleging that she was neglected due to an injurious environment and at substantial risk of physical injury. According to the State, in February 2019, Zoey was present during a "domestic altercation" between Alan and Tiffany. As a result of this altercation, Alan and Tiffany were recommended for intact family services, but neither parent cooperated with services. Tiffany also allegedly suffered from mental illness and was noncompliant with medication.

¶ 5 The State further alleged that, in April 2019, Zoey was present during another domestic altercation between Tiffany and an unidentified family member. Tiffany was hospitalized following this physical altercation. DCFS informed Alan that Tiffany could no longer reside with him after she was released from the hospital. However, Alan allowed Tiffany to return to his home upon her discharge from the hospital. Tiffany admitted that she was unable to care for Zoey.

¶ 6 At the hearing on the State's petition for temporary custody on July 18, 2019, Alan stipulated that there was probable cause to find Zoey abused or neglected and that it was necessary to remove her from the home. The court placed Zoey in the temporary custody of the DCFS guardianship administrator with the right to place her in an appropriate home.

¶ 7 An adjudicatory hearing commenced on January 13, 2020. At the hearing, the State first called Clarissa Christian, the caseworker for Tiffany and Alan, to testify. Ms. Christian testified that the case first came to the attention of DCFS after Zoey's birth because Tiffany had mental health issues and a history of substance abuse. At the time Ms. Christian became involved in

the case, on December 18, 2018, a safety plan was in place where the paternal grandmother would supervise Zoey.

¶ 8   Ms. Christian spoke with Tiffany and Alan on December 18 to discuss their progress with services. On December 28, she again spoke with both parents in response to a "hotline call." The conversation revealed that, at some point between December 18 and December 28, Tiffany and Zoey were locked in the bathroom at home after Alan and his mother came home intoxicated and Alan kicked the bathroom door. As a result, Alan and Tiffany were taken to the police station, and Zoey was placed with her paternal aunt and uncle.

¶ 9   Alan admitted that he and his mother had gone to a birthday party and come home intoxicated, but Ms. Christian could not recall whether he responded to Tiffany's allegation that he kicked the bathroom door. Ms. Christian recommended that Tiffany and Alan engage in domestic violence counseling and further informed them that the safety plan would be modified allowing Tiffany to have supervised visits with Zoey and that Alan would be barred from contact with Zoey.

¶ 10   Ms. Christian next talked to the parents in January 2019, when she referred Tiffany for a mental health assessment, Alan for a substance abuse assessment, and both parents for parenting classes. Ms. Christian also recommended that Tiffany move out of the home where she lived with Alan, and Tiffany agreed but did not follow through.

¶ 11   On March 14, 2019, the safety plan called for Zoey to be returned home, but on April 10, 2019, a hotline call was received, which put Tiffany and Alan in violation of the safety plan. Ms. Christian spoke to the parents on April 26, 2019, about the hotline call, and both denied the allegations that had been made in the call. Tiffany also told Ms. Christian that she had recently been hospitalized.

¶ 12   In the beginning of May 2019, Ms. Christian visited Tiffany during another hospitalization, which Tiffany stated occurred as a result of a "breakdown" she had at work. During this conversation, Tiffany told Ms. Christian that she did not want Zoey returned to her care but wanted instead to get her life together. Tiffany stated that she only wanted visits with Zoey.

¶ 13   As of May 2019, neither Tiffany nor Alan was receiving the services recommended by DCFS. However, both parents had completed parenting classes, and Alan tested negative for drugs. Ms. Christian testified that Alan was unable to complete his domestic violence classes because, as the perpetrator of the violence, he had to pay for the classes and he could not afford the classes. At this point, the court asked whether the violence Alan perpetrated was limited to the pounding on the bathroom door. Ms. Christian answered affirmatively but also noted that Alan was "controlling" of Tiffany and would not allow her to have a cell phone. The court acknowledged that the controlling conduct was "nefarious" but questioned whether this impacted Zoey, asking "[w]here is the neglect here?" Ms. Christian stated that Zoey was not neglected but "at risk." The State then reminded the court that it had not put on all its evidence.

¶ 14   The State offered Tiffany's medical records into evidence. The records revealed that in April 2019 Tiffany submitted a urine sample that tested positive for THC and cocaine. Also in April 2019, Tiffany underwent a psychiatric evaluation in connection with her hospitalization in which she presented with "worsening depression and suicidal ideation." Most recently, in March 2019, she attempted suicide by overdosing on medications.

¶ 15   The State next called Showanda Dixon, the child protection specialist with DCFS assigned to Zoey's case. Ms. Dixon testified that she spoke to Tiffany on July 2, 2019, at Tiffany's

father's home. Ms. Dixon asked Tiffany about an altercation that occurred between Tiffany and Zoey's paternal grandmother several weeks earlier. Tiffany stated that she choked Zoey's grandmother to "get her to shut up." Ms. Dixon advised Tiffany that Zoey was in the care of Zoey's aunt and uncle and that there was "the potential to screen the case in for custody." Tiffany agreed that Zoey should remain with her aunt and uncle. Tiffany stated that she could not take care of Zoey at this time because she needed to find a job and get back on her feet.

¶ 16    Ms. Dixon testified that she spoke to Alan on June 17, 2019. Alan was upset about the hotline calls and told Ms. Dixon that Tiffany was no longer living with him. Alan further informed Ms. Dixon that he had completed the required parenting class and substance abuse assessment online. However, he was unable to afford the domestic violence services he was asked to complete. DCFS then found free services for Alan, but he did not participate.

¶ 17    Ms. Dixon also testified that Alan violated the safety plan that was in place on two occasions. First, he took Zoey out of his mother's care, in violation of the safety plan that was in place after Zoey's birth. Second, he allowed Tiffany to live with him after she was discharged from the hospital in May, which was also not permitted under the plan in place in the spring of 2019.

¶ 18    The State rested its case, and the Cook County Public Guardian called Alan to testify. Alan testified that he lived with his father and that his mother had recently passed away. Alan admitted that he and Tiffany had a tumultuous relationship but denied kicking the bathroom door while Tiffany was locked inside. Alan further denied using cocaine and stated that he only drank alcohol.

¶ 19    In response to the court's question regarding whether Alan worked, Alan stated that he had a learning disability. Alan objected to the public guardian's further questions about Alan's learning disability, and the following exchange occurred:

"MS. DONOVAN [(ASSISTANT PUBLIC GUARDIAN)]: Judge I assume that that learning disability didn't just come up since the case—

THE COURT: Well, obviously not since he is on Social Security. But the question I have in my mind is if there was an issue there, why the agency—you know they seem to have come up with—concocted all kinds—not all kinds—a couple of things which haven't gone anywhere. If the—if they were really doing it because they [sic] he's developmentally delayed, they should have pointed that out.

* * *

THE COURT: The agency came in; they found the mother was mentally ill. And they didn't trust the father. They took the kid away. But they did it because they [sic] he wasn't doing services. Everything I heard, he was except for domestic violence, but there was no reason for domestic violence. That's where we are.

* * *

MS. DONOVAN: The additional concern was that [Alan] despite knowing that the mother had been hospitalized and had bipolar disorder—

THE COURT: He let her in the house for a little while.

MS. DONOVAN: Continue to have contact with the baby.

THE COURT: A lot of mentally ill people—and there is not a word that the baby suffered because of that. I haven't heard one word that this baby ever suffered from anything. You know? The father allegedly kicked the door. The mother is mentally ill.

- 4 -

There is probably something else going on, but it wasn't alleged and it wasn't proved, whatever other thing is. But I ain't seen it."

¶ 20 The court then questioned Alan extensively about his work history. Alan testified that he used to work in a plumbing warehouse but had to leave because the job required him to read. In response to further questions, Alan explained that he could read but that some "stuff" is hard for him to read. The court stated that it was not a crime to not be able to read and handed Alan a Vogue magazine to read. The record indicates that Alan ready inaudibly from the magazine.

¶ 21 Following the conclusion of Alan's testimony, the court stated that the State had met its burden of proof with regard to Tiffany but not Alan. The court queried "[h]ow can I find the child neglected if one parent is neglectful but the other parent is not." The court also expressed doubt that there was a neglectful environment and stated there was no evidence that Zoey was harmed or hurt. Ultimately, the court continued the case to make its determination.

¶ 22 On February 3, 2020, after hearing additional argument, the court rendered its decision as follows:

"[T]he evidence with respect to the mother was overwhelming. The only question was whether there could be custody with the father, and more likely that could come out in [the dispositional hearing]. The father is limited intellectually, I think he is developmentally delayed, and that came across in the hearing. The State didn't plead it but it came across, so I am going to make a finding."

The court clarified that it was conforming the pleadings to the proofs. Specifically, the court found that Zoey was neglected due to an injurious environment by both Tiffany and Alan, and at substantial risk of injury with respect to Tiffany. Because Alan was not prepared to proceed with the dispositional hearing that day, the court continued the case.

¶ 23 A dispositional hearing was held on March 9, 2020. Both parents and Alan's attorney were absent from the hearing. Zoey's caseworker Lori Rodriguez-Ardondo testified that Zoey was doing well in her placement with her paternal aunt and uncle. Ms. Rodriguez-Ardondo testified that Zoey's aunt and uncle had an open-door policy as far as the parents visiting Zoey but that Tiffany has not visited Zoey and Alan's last visit was on December 22, 2019. According to Ms. Rodriguez-Ardondo, she could not get in contact with Tiffany, and during her last phone call with Alan in or around February 2020, Alan threatened her with a restraining order if she contacted him again.

¶ 24 The court stated that, because both parents were absent, it would enter a dispositional order finding the parents unable to care for Zoey and place her in DCFS custody; however, the court would entertain oral motions to vacate the dispositional order from the parents at a later date.

¶ 25 The case was next before the court on January 5, 2021, via Zoom for a permanency hearing and Alan's motion to vacate the dispositional order. Alan was present through his attorney. Ms. Rodriguez-Ardondo testified that Zoey was continuing to do well in her placement with her paternal aunt and uncle, who wished to adopt her. She further testified that Alan had last visited Zoey in December 2019 and that she had not attempted to contact him since he threatened her with a restraining order. The court denied the motion to vacate the dispositional order and set a goal of termination of parental rights.

¶ 26 Alan filed a timely notice of appeal from the court's adjudication and dispositional orders following the denial of his motion to vacate on January 26, 2021.

¶ 27                                                    ANALYSIS

¶ 28        At the outset, we find that we have jurisdiction to review the adjudication and disposition orders pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals of final orders.

¶ 29        Alan initially challenges the trial court's finding of neglect at the adjudicatory hearing. The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) prescribes a two-step process to determine whether a minor should be made a ward of the court (*In re A.P.*, 2012 IL 113875, ¶ 18). The first step is an adjudicatory hearing at which the court considers whether a minor is abused, neglected, or dependent. *In re J.S.*, 2020 IL App (1st) 191119, ¶ 69; see also 705 ILCS 405/2-18(1) (West 2018). Importantly, the cause of the neglect is not relevant at the adjudicatory stage. *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004) (citing *In re R.B.*, 336 Ill. App. 3d 606, 615-16 (2003)). Indeed, a child may be neglected, but it may be impossible to determine which parent or guardian is at fault. *Id.* Thus, the Act instructs the court to consider only whether the child *is neglected* and not whether the parents *are neglectful*. *Id.*

¶ 30        The State bears the burden of proving neglect by a preponderance of the evidence. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 225. This means that the allegations of the petition are more probably true than not. *Id.*

¶ 31        The Act provides, in relevant part, that a minor is neglected when their environment is injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2018). An injurious environment, while a " 'broad' " and " 'amorphous' " concept, is generally understood as one in which the parents have breached their duty to ensure a safe and nurturing environment for their child. *In re Alexis H.*, 401 Ill. App. 3d 543, 557 (2010) (citing *In re A.W.*, 231 Ill. 2d 241, 254 (2008)). Cases involving neglect and abuse are *sui generis* and should be decided on their own unique facts. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 31.

¶ 32        We review a circuit court's finding of neglect under a manifest weight of the evidence standard. See *In re William H.*, 407 Ill. App. 3d 858, 866 (2011). In other words, we will not disturb the court's findings unless the record clearly demonstrates that the court should have reached the opposite result or the court's determination is unreasonable, arbitrary, and not based on evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008); *In re K.T.*, 361 Ill. App. 3d 187, 201 (2005). Such deference is warranted because the trial court is in a much better position to observe the witnesses and assess their credibility. *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991).

¶ 33        In this case, the evidence supported the trial court's conclusion that Zoey was neglected due to an injurious environment. Zoey's mother, Tiffany, admitted that she could not properly care for Zoey. This was borne out by Tiffany's hospitalization in April and May 2019, at which time she tested positive for the presence of illegal drugs and admitted to attempting suicide and having suicidal ideation. In addition, Tiffany stated that Alan was emotionally abusive. Tiffany's mother confirmed to hospital workers that Alan abused Tiffany and offered her drugs, including methamphetamines. For Alan's part, he failed to appreciate the dysfunctional relationship between himself and Tiffany and allowed her to live with him after her hospitalization in violation of the safety plan.

¶ 34        To be sure, the court also found that Alan contributed to Zoey's neglect because he was intellectually disabled. Alan disputes that there was any evidence of intellectual disability introduced at trial. However, we may affirm the trial court's decision on any basis appearing in the record regardless of whether the trial court relied on that basis. See *In re Brianna B.*, 334

Ill. App. 3d 651, 655 (2002). And as discussed (*supra* ¶ 33), the trial court's determination that Zoey was neglected due to an injurious environment was amply supported by the record evidence regarding Tiffany's mental illness, drug use, and her own admission that she could not care for Zoey, as well as Zoey's exposure to Alan and Tiffany's abusive relationship. At the adjudicatory stage, the court needed only to determine that Zoey was *neglected*, not that either parent was *neglectful*. See *Arthur H.*, 212 Ill. 2d at 467. The evidence of neglect—regardless of the perpetrator of that neglect—was more than clear. As such, the court's finding was not against the manifest weight of the evidence.

¶ 35    Alan next argues that the trial court abandoned its role as neutral factfinder when it questioned him regarding his ability to read. A trial court has the authority to question witnesses in order to elicit the truth or clarify material issues that may be ambiguous. *People v. Jackson*, 409 Ill. App. 3d 631, 646-47 (2011). In particular, in juvenile proceedings, the court has the authority to "direct the course" of the proceedings to promptly and fully gather information bearing on the child's current condition and future welfare. 705 ILCS 405/1-2(2) (West 2018).

¶ 36    The determination of whether the court's questioning of a witness is appropriate depends on the facts and circumstances of each case and is largely left to the court's discretion. *Jackson*, 409 Ill. App. 3d at 647. A court abuses its discretion when it adopts the role of advocate for one of the parties and prejudices the opposing party. *Id.* To establish prejudice in a bench trial, the aggrieved party must show "the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence." *People v. Smith*, 299 Ill. App. 3d 1056, 1063 (2011).

¶ 37    Here, Alan has not shown he was prejudiced by the trial court's questioning. Far from prejudging the outcome of the proceedings, the court was clearly trying to discern the basis for the State's allegations of neglect by asking questions regarding Alan's occupation and intellectual abilities. Nothing in the record indicates that the court was acting as an advocate for the State; instead, it was acting on its statutory authority to gather information to determine Zoey's present condition and future welfare. Therefore, we conclude that the court did not abuse its discretion in questioning Alan about his ability to read and his employment status.

¶ 38    Finally, Alan challenges the court's dispositional order finding him unable to parent Zoey. After a trial court finds a minor abused, neglected, or dependent, the court moves to the second step of the two-step procedure to determine whether a minor should be made a ward of the court, which is a dispositional hearing. *In re J.S.*, 2020 IL App (1st) 191119, ¶ 69. There, the court determines whether it is consistent with the health, safety, and best interests of the minor that the minor be made a ward of the court. *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 31 (citing *In re Yohan K.*, 2013 IL App (1st) 123472, ¶ 108). We will not reverse a court's findings of fact with regard to dispositional unfitness unless they are against the manifest weight of the evidence, and a trial court's dispositional order will not be reversed unless it is an abuse of discretion. *In re A.T.*, 2015 IL App (3d) 140372, ¶ 13.

¶ 39    The evidence at the initial dispositional hearing in March 2020 as well as the hearing on Alan's motion to vacate the March 2020 dispositional order more than supported the trial court's finding that Alan was unable to care for Zoey. As of January 2021, the date of the hearing on Alan's motion to vacate the dispositional order, Alan had not visited or otherwise had contact with Zoey in over a year. Although Zoey's guardians (Alan's brother and sister-in-law) had an open-door policy as far as Alan's visitation with Zoey, Alan had not visited

Zoey since December 2019. There was no explanation offered for this failure to maintain at least some contact with Zoey. Indeed, Alan threatened Zoey's caseworker with a restraining order when she attempted to follow up with him regarding visitation. Under these circumstances, the trial court's order placing Zoey in the custody of the DCFS guardianship administrator was in no way an abuse of discretion.

¶ 40                                    CONCLUSION

¶ 41        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 42        Affirmed.