2023 IL App (1st) 221770-U

FIFTH DIVISION
MAY 5, 2023

No. 1-22-1770

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | Appeal from the |
| DANA CLAR, | ) | Circuit Court of |
|     Petitioner, | ) | Cook County. |
| and | ) | |
| DAVID DAIDONE, | ) | |
|    Respondent-Appellant, | ) | |
| _____ ) | ) | No. 20 D 1925 |
| SCOTT CLAR and PAULA CLAR, | ) | |
|    Petitioners-Appellees, | ) | |
| and | ) | Honorable |
| DAVID DAIDONE, | ) | Karen J. Bowes, |
|    Respondent-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Delort and Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's judgment granting grandparent visitation is reversed.

¶ 2    On March 4, 2020, Dana Clar[1] filed a petition for dissolution of marriage against David Daidone in the circuit court of Cook County. That marriage produced one child, D.S.D. In September 2020, Dana's whereabouts became unknown, and on December 31, 2020, Dana's

_____

[1]Since some of the individuals involved share the same last name, for clarity, we will refer to everyone by their first name.

parents, Scott and Paula Clar, filed a petition for grandparent visitation with D.S.D. On October 24, 2022, the trial court granted the petition for grandparent visitation. On appeal, David argues that: (1) Dana was not missing pursuant to statute and (2) he had not unreasonably denied visitation with D.S.D. to the grandparents. For the reasons that follow, we reverse the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4      On March 4, 2020, Dana filed a petition for dissolution of marriage against David. In May 2020, Dana was admitted into a substance abuse rehabilitation facility and custody of her child, D.S.D., was temporarily given to David on a full-time basis. Shortly after she checked into the facility, she checked herself out of the rehabilitation facility and then her whereabouts became unknown. On May 15, 2020, the trial court entered an agreed order transferring custody to David and allowing for parenting time for Dana with D.S.D. The order also allowed Dana's parents, Scott and Paula, to have visitation with D.S.D., at times to be arranged by David and Dana's parents. The visitation was to begin June 5, 2020, and was not to exceed once per week. On June 17, 2020, the trial court appointed Carmen Quinones to serve as guardian *ad litem* (GAL) for D.S.D.

¶ 5      On September 9, 2020, Scott and Paula sought to enforce the May 15, 2020, agreed order, which allowed visitation between them and D.S.D. On December 20, 2020, David filed a motion to modify the May 15, 2020, agreed order pertaining to visitation by the grandparents of D.S.D. On December 31, 2020, Scott and Paula filed a petition for grandparent visitation with D.S.D. In the petition, they alleged that Dana had been missing since August 2020 and that David had unreasonably restricted visitation between them and D.S.D. David filed a motion to dismiss alleging that Scott and Paula lacked standing to bring their petition because Dana's whereabouts were not unknown citing Scott's and Paula's telephone and email communications with Dana and

arguing that they had not reported her missing to law enforcement. The trial court denied the motion to dismiss, finding that Scott and Paula had made sufficient allegations to show that Dana was missing and the grandparents had standing.

¶ 6    On February 3, 2022, the trial court conducted a hearing on the petition for grandparent visitation. During the hearing, Paula testified that she and her husband, Scott, were the maternal grandparents of D.S.D. She stated that, after her daughter left a rehabilitation facility around May 2020, she had limited communication with her daughter until August 2020. She said that around that time, Scott reported Dana missing to the police. Scott and Paula regained contact with her around August 29, 2020, when the GAL, Carmen, contacted them saying that Dana wanted to go to a substance abuse rehabilitation center. Scott and Paula arranged a hotel room for their daughter to stay prior to her admission to the facility and then saw her later around that time. Paula unsuccessfully tried to arrange, via text message with David, a FaceTime call between Dana, Paula, and D.S.D. on August 29, 2020. Text messages between Paula and David, which were admitted during the hearing, corroborate her timeline of when she regained in-person contact with her daughter. In 2020, on September 1 or September 2, Paula checked Dana into a rehabilitation facility. She ran away from the facility a couple days later, and at the time of the hearing, Paula was unaware of where Dana was residing.

¶ 7    Scott testified that he made a report to the Skokie Police Department that his daughter, Dana, was missing in August 2020. He said that he was unable to obtain a written report because there was no indication that his daughter wanted to be found. He testified that after making the report, he saw his daughter, Dana, in-person in August 2020 because Dana had expressed a desire to the GAL, Carmen, that she wanted to go back to a substance abuse rehabilitation facility. He said his wife took Dana to a rehabilitation facility, which she ran away from a couple days later.

After her disappearance from the facility, he and his wife had periodic telephone and email communication with their daughter, but they did not know her whereabouts. On December 31, 2020, he filed a petition for grandparent visitation.

¶ 8    The GAL, Carmen, and David testified as well. After the testimony, the trial court took the matter under advisement. On October 24, 2022, in a written order, the court found that Dana was missing since her whereabouts had been unknown for over three months and Scott reported her missing to police officers in August 2020. The court ruled in favor of the grandparents and granted them visitation on the third weekend of each month and a seven-day period during the summer. On November 22, 2022, David filed a notice of appeal.

¶ 9                              ANALYSIS

¶ 10    We note that we have jurisdiction to consider this matter, as David filed a timely notice of appeal following the trial court's judgment. See Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 11    Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), we must issue our decision within 150 days of the filing of a notice of appeal except unless there has been "good cause shown." The trial court entered its order on November 22, 2022, which means our decision was due on April 21, 2023. The briefing schedule originally provided to the parties was one of an Illinois Supreme Court Rule 303 (eff. July 1, 2017) case, instead of an accelerated matter pursuant to Rule 311(a)(5). The corrected briefing schedule was not entered until January 27, 2023, pursuant to an unopposed motion by David requesting that the matter be placed on an accelerated docket. As a result, the briefing in this matter was delayed, because pursuant to Rule 311(a)(7), the appellant's brief should have been due on January 24, 2023. We find good cause exists here to file this case outside the time frame allowed in Rule 311.

¶ 12    On appeal, David contends that the trial court erred by finding that Dana was missing and David had unreasonably withheld visitation between D.S.D. and her maternal grandparents, which resulted in harm to D.S.D.

¶ 13    Section 602.9 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.9 (West 2020)) (Act) creates an avenue for grandparents to have standing to petition for visitation under certain enumerated circumstances. Section 602.9(c)(1)(A) of the Act (750 ILCS 5/602.9(c)(1)(A) (West 2020)) states that a grandparent may bring a petition for visitation, if a minor is over the age of one years old, there is an unreasonable denial of visitation by a parent, which has caused "mental, physical, or emotional harm to the child," and "the child's other parent is deceased or has been missing for at least 90 days. For purposes of this subsection a parent is considered to be missing if the parent's location has not been determined and the parent has been reported as missing to a law enforcement agency."

¶ 14    "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Encompassed within the well-established fundamental right of parents to raise their children is the right to determine with whom their children should associate." *Lulay v. Lulay*, 193 Ill. 2d 455, 473-74 (2000). To that end, the grandparent visitation provision of the Act represents a "significant interference" to that right, which is why the procedure in section 602.9(c)(1)(A) of the Act was created. *Lulay*, 193 Ill. 2d at 474. The standing requirements in section 602.9(c) of the Act are "safeguards [to] the superior right of parents to the care and custody of their children." *In re Scarlett Z-D.*, 2015 IL 117904, ¶ 35. The standing requirements with respect to visitation petitions are strictly construed. See *In re Visitation of J.T.H.*, 2015 IL App (1st) 142384, ¶¶ 19, 24.

¶ 15      The primary objective of statutory construction is to discern the legislature's intent, and the best way to ascertain that intent is the plain language of the statute. *Bank One Milwaukee v. Sanchez*, 336 Ill. App. 3d 319, 323 (2003). The terms in a statute are to be considered in conjunction with every other section of the statute, not in a vacuum. *In re Estate of Crawford*, 2019 IL App (1st) 182703, ¶ 30. "[A] court construing the language of a statute will assume that the legislature did not intend to produce an absurd or unjust result [Citation], and will avoid a construction leading to an absurd result, if possible [Citation]." (Internal quotation marks omitted.) *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 283 (2010). Questions regarding statutory construction are reviewed *de novo. Oswald v. Hamer*, 2018 IL 122203, ¶ 9.

¶ 16      While the parties do not focus on whether the statute requires the report to law enforcement to be made after the last period of disappearance, the answer to that question is dispositive in this case. Therefore, we will consider the effect of the timing of the filing of the police report.

¶ 17      The statute makes it clear that for a parent to be considered missing, a parent's whereabouts need to be unknown for at least 90 days and a *report made to a law enforcement agency*. 750 ILCS 5/602.9(c)(1)(A) (West 2020). The legislature's inclusion of language requiring a report to law enforcement cannot be seen as superfluous. *In re Marriage of Mathis*, 2012 IL 113496, ¶ 20. The use of the word "made" in the past tense shows that the report needs to occur before the filing of the petition for visitation. However, while the statute is silent as to the effect of filing a police report before someone's location becomes known again, it logically follows that the report must be made after the parent's whereabouts become unknown for the last time. That reading would make a prior missing person report void if a parent, whose location was previously unknown, becomes "determined."

¶ 18    We recognize this reading of the statute creates a problem, when it comes to parents with mental health or substance abuse issues, whose issues may cause their location to become known and unknown within the statutory 90-day period. That would potentially never grant standing to a grandparent seeking visitation under that provision of the Act. However, section 602.9(c)(1)(C) of the Act presents the same problem for a parent who has periodic terms of incarceration. See 750 ILCS 5/602.9(c)(1)(C) (West 2020) (stating a grandparent has standing if there is an unreasonable denial of visitation by a parent, which has caused "mental, physical, or emotional harm to the child" and "a parent has been incarcerated in jail or prison for a period in excess of 90 days immediately prior to the filing of the petition"). If a parent, who was previously incarcerated for at least 90 days, is released from custody, a grandparent would have standing and then lose it. The clock would then begin after the next 90-day period of incarceration. While that may not seem like an ideal result, the plain language of the statute allows for that possibility. It is up to the legislature to create an exception to address these potential standing issues, not the courts. *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004) (stating the court "cannot rewrite a statute under the guise of statutory construction or depart from the plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature"). Here, Scott and Paula could simply have filed a police report prior to the filing of their petition for visitation in December 2020, since 90 days had passed from the last period of Dana's location being determined.

¶ 19    The purpose of the provision of the statute permitting grandparent visitation was to ensure close relationships between grandparents and a child were not broken due to a divorce. *Lulay*, 193 Ill. 2d at 476. As the legislature recognized " 'the trauma of an abrupt termination of a meaningful relationship with grandchildren can really be detrimental to the child. This provides the entry for grandparents to have some redress to get to their *** grandchildren, and again to create some form

of family.' " *Lulay*, 193 Ill. 2d at 476 (quoting 82d Ill. Gen. Assem., House Proceedings, May 6, 1981, at 150-51 (statements of Representative Topinka). While recognizing the importance of maintaining ties between a minor and their grandparents, the right is restricted by the non-parent visitation provision of the Act, due to the fundamental right of parents to decide who they allow to associate with their children. Accordingly, section 602.9(c)(1)(A) of the Act must be strictly construed to interfere with this right as little as possible to effectuate the interest of maintaining the relationship between grandparents and grandchild. *In re Visitation of J.T.H.*, 2015 IL App (1st) 142384, ¶ 24. As such, we find the only way to read the statute, without an absurd result, is that a report must be made after the parent's whereabouts become unknown for the last time and *before the filing of petition for grandparent visitation*. Accordingly, we move on to whether the trial court erred in finding that Dana was missing pursuant to the Act.

¶ 20    This court reviews the trial court's factual findings under the manifest weight of the evidence standard. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 32. "[W]e will find that a trial court's decision is against the manifest weight of the evidence only where a review of the record clearly demonstrates that the result opposite to [the one] reached by the trial court was the proper result." (Internal quotation marks omitted.) *In re Anaya R.*, 2012 IL App (1st) 121101, ¶ 50. A finding is against the manifest weight of the evidence if it is unreasonable, arbitrary, and not based on the evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008).

¶ 21    The trial court found both Paula and Scott credible and that in August 2020, Scott reported to law enforcement that Dana was missing. However, by Scott's own admission, Dana whereabouts became known, due to her contacting the GAL, and he saw Dana in-person after he spoke to the police department and reported her missing. Text messages between David and Paula, presented at the hearing, showed Paula was with Dana and unsuccessfully attempted to arrange a

Facetime call with D.S.D., facilitated by David. Paula testified that she last saw her daughter in-person on September 1 or September 2 of 2020 when they dropped her off at the substance abuse rehabilitation facility. The trial court found her missing despite these facts. That finding was clearly against the manifest weight of the evidence because it was not based on the evidence adduced during the hearing and was unreasonable in light of the testimony and text messages presented at trial. Since the report to law enforcement was not made prior to the filing of the petition, Scott and Paula did not have standing to bring a petition for grandparent visitation. Accordingly, we reverse the trial court's factual finding that Dana was missing and as a result, reverse the court's October 24, 2022, order granting visitation to Scott and Paula. Since we have reversed the order on the grounds that Dana was not missing, we need not address whether David unreasonably denied visitation.

¶ 22    While this court is sympathetic to the grandparents' concern about losing their relationship with their granddaughter, the facts of this case do not give them standing to bring a suit. We commend them for trying to be part of their grandchild's life, but to allow them visitation over David's wishes would interfere with his fundamental rights as a parent. From the testimony and the record, it appears that David recognizes the importance of his daughter's relationship with her grandparents. Hopefully, the cessation of this litigation will decrease the hostility between the parties, so that they all contribute to the healthy, loving environment a child needs.

¶ 23                                     CONCLUSION

¶ 24    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 25    Reversed.