2025 IL App (1st) 241822-U
Order filed March 27, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-24-1822

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Z.B., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 24 JA 168 |
| | ) | |
| v. | ) | |
| | ) | |
| T.W., | ) | Honorable |
| | ) | Peter J. Vilkelis, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm where the mother failed to establish that the circuit court committed plain error or *per se* error in examining two witnesses at the adjudication and disposition hearings and that her counsel was ineffective for not objecting to the circuit court's examinations.

¶ 2    Respondent-appellant, T.W., (the mother) appeals from orders of the circuit court finding her son, Z.B., born on December 16, 2016, to be neglected and that it was in Z.B.'s best interest that he be adjudged a ward of the court, placing him in the custody of the Department of Children

and Family Services (DCFS), and setting a permanency goal of return home within 12 months. On appeal, the mother argues that the circuit court erred in examining two state witnesses as to an affidavit which was not admitted into evidence during the adjudication and disposition hearings, an issue which she forfeited. We affirm after finding the mother failed to establish plain error, *per se* reversible error, or ineffectiveness of counsel.

¶ 3     On February 26, 2024, the State filed a petition for adjudication of wardship, naming the mother and D.B., the father of Z.B.,[1] and alleging that Z.B. was neglected in that he was not receiving proper or necessary care and support for his wellbeing and was subject to an injurious environment, and abused due to a substantial risk of physical injury pursuant to sections 2-3(1)(a), (1)(b), and (2)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (1)(b), and (2)(ii) (West 2022)), and a motion for temporary custody. The specific factual allegations in support of the petition and motion were:

> "[Z.B.] has untreated mental health issues and a history of psychiatric hospitalizations. [Z.B.] has been diagnosed with attention deficit hyperactive disorder and disruptive mood dysregulation disorder. On or about February 7, 2024, [Z.B.] was evaluated due to increased aggression and homicidal ideations. It was recommended that he be psychiatrically hospitalized. Mother has untreated mental health issues. Mother was previously diagnosed with mood disorder and obsessive-compulsive disorder. In October of 2023, [Z.B.] disclosed that mother had punched him in the stomach. Mother admitted to hitting [Z.B.] but states that she "popped" him in the chest. Mother has made statements about not wanting to parent [Z.B.] if he is left in her care. Father states that he is not

---

[1] The father is not a party to this appeal.

currently able to care for [Z.B.]. Father states that he has safety concerns with [Z.B.] remaining with mother but that he failed to take any corrective action. Paternity has been established."

¶ 4 The State's pleadings were supported by the affidavit of Virgil Means, an investigator for DCFS (affidavit). Means asserted that DCFS began an investigation when Z.B. reported to school officials that the mother had punched him in the stomach and the punch hurt him. In the course of this investigation, Means spoke with the mother and she made certain statements. Means averred:

"[The mother] came into the school crying and admitted to hitting [Z.B.]. The mother said that she popped him in the chest but not the stomach, he does not have any injuries or bruises. [She] said that she doesn't want [Z.B.] anymore, and she was going to drop him off at the Fire Department. School officials pushed [the mother] to go to parenting classes but states that she needs more services as [Z.B.] is a trigger for her, she will often lash out at him. [She] states that she is tired and wants him gone so she can get on with her life. When school officials states [*sic*] that [Z.B.] didn't ask to be here, [the mother] said 'Yes, I know and regret my mistake everyday!' [She] said that she has no energy or capacity to care for [him]. [She] is afraid of what might happen to [him] if she continues to have to care for [him]. School officials believe that [the mother] has mental health issues and no support system."

¶ 5 Additionally, Means averred that the mother had been the subject of seven investigations during the past three years "with five unfounded and two pending." The investigations of the mother have included allegations of physical abuse and "statements of wanting to abandon or kill [Z.B.]." In 2021, the mother was diagnosed with a mood disorder and obsessive-compulsive disorder and was not engaged in any mental health services. She had been prescribed medication

but had issues with compliance. Z.B. has attention deficit hyperactive disorder (ADHD) and disruptive mood dysregulation disorder. He has been psychiatrically hospitalized four times. The mother declined intact family services which would have assisted in coordinating services and monitoring Z.B.

¶ 6     The court granted the motion for temporary custody and entered various orders, finding D.B. was the father of Z.B., appointing the Cook County Public Guardian as the attorney and guardian *ad litem* (GAL) for Z.B., and allowing supervised day visits.

¶ 7     The court held an adjudication hearing on August 2 and September 10, 2024. The first day of the hearing was scheduled for the parties to tender exhibits for admission into evidence. Only the State sought the introduction of any exhibits. Without objection, the court admitted Z.B.'s medical records from Streamwood Behavioral Health Hospital (Streamwood) into evidence.

¶ 8     The records revealed, in part, that Z.B., at age 6 years, was admitted to Streamwood on April 7, 2023 "for agitation, disruptive behavior, impulsivity and marked aggressive behavior" which posed a danger. Z.B. stated that "My mom sent me here." There were notes that his relationship with his mother was "bad" and he "has experienced his parents separating, bullying, and family conflict, which could be contributing to his aggression. Z.B. was discharged from inpatient treatment on April 21, 2023. According to the discharge report, his mood was "fairly stable," and he was engaged in therapeutic programming and "committed to aftercare plan." As recommended, Z.B. began a "step-down" partial hospitalization program on April 24, 2023 to work on aggressive behavior and impulse control. Z.B. came to Streamwood during the day and participated in individual and group therapy and other activities and services. Z.B. was discharged from the partial hospitalization program on May 26, 2023. A discharge report noted that he had responded well to medication management and therapies and showed an increased ability to

regulate his behavior. Z.B. was referred to an intensive outpatient program which he began on May 30. The program included outpatient individual and group therapy and medication management.

¶ 9     Z.B. was admitted to Streamwood for inpatient treatment again, on February 9, 2024, due to a "worsening aggression" and extreme hyperactivity. He had been discharged from Montrose Hospital on February 4. The mother reported that Z.B. had been "aggressive at school [and] with mom and destroying property." The notes indicated that he had threatened to kill teachers and school staff. During this Streamwood hospitalization, Z.B. again received therapies and medicine management to control his aggression and impulsiveness. The mother told medical staff that there were times when Z.B. was not on his medications because the medications were "out of stock." She told a therapist that Z.B.'s school found he generally behaved well except for the incident related to this hospitalization. The therapist participated in an individualized education program meeting with the school and the mother. The therapist recommended that the school share the resources and tools that its staff used with Z.B. so that the mother could use those at home. In this way there could be consistency and stability in both the home and academic settings. Streamwood learned of DCFS involvement with the family when it prepared for Z.B.'s discharge. Upon his release, on February 22, Z.B. went to the home of the maternal grandmother (the grandmother). According to the records, on the day of discharge, Z.B. was "a lot calmer, less hyperactive[,] more redirectable ***. Less anxious. Focused." He was "calm and cooperative throughout the discharge."

¶ 10    On the second day of the adjudication hearing, the court heard testimony from Serena Mathena and Means. Because the father is not a party to the appeal, we will discuss only the testimony which is relevant to the mother.

¶ 11    Mathena, a DCFS public service administrator supervisor, was assigned to supervise a sequence F or sixth investigation from October 2023 and a sequence G or seventh investigation from February 2024 involving Z.B. The sequence F investigation related to a time when the mother was "overwhelmed with caring for [Z.B.]." She reportedly had punched him in the stomach in response to his behavior and stated that she would abandon him. The sequence G investigation "came in for medical neglect." Z.B., then seven years old, had been psychiatrically assessed to need inpatient hospitalization and the mother reportedly had "refused to coordinate that level of care for him." Z.B. was hospitalized at Streamwood and upon his discharge, he was placed with the grandmother.

¶ 12    Mathena testified that, on February 22 (the day Z.B. was discharged from Streamwood) he had several phone conversations with the mother. The mother explained that Z.B. had mental health and behavioral complexities, had been psychiatrically hospitalized four times, and had a diagnosis of autism. Z.B. was receiving outpatient services from a psychiatrist, a play therapist, and a behavioral therapist. Mathena stressed to the mother the importance of coordinating Z.B.'s outpatient care to best achieve his stabilization in the community and avoid continuing hospitalizations. Mathena also recommended that the mother participate in DCFS intact services, which would monitor Z.B.'s outpatient programs, but the mother declined those services. When Mathena raised Z.B.'s report that she had hit him in the stomach, the mother denied that she had done so. She said she used "time outs" to discipline him.

¶ 13    Mathena had a phone conversation with the father on February 23. The father stated he had been the victim of domestic violence where the mother was the aggressor. She also interfered with his access to Z.B.

¶ 14 On cross examination by the mother, Mathena testified that the mother has also been in counseling. The mother had available family support from her mother and sister. Mathena did not think that Z.B. was in need of any additional services other than "mental health support."

¶ 15 On redirect, Mathena explained that although the mother had family members who could help her, "she just did not want people in her business." And because she believed there were "too many people that were in her business" she did not want the intact services.

¶ 16 Means testified that he was assigned to the F sequence October 2023 investigation. He met with Z.B. and the mother at the school. Z.B. asserted that the mother had punched him when he was not listening to her and told him that she was tired of him. The mother acknowledged that she hit Z.B. She said that Z.B. was "hard headed and he didn't want to listen and she was getting tired." The mother said she "wanted to give [Z.B.] up" but also said she needed some help.

¶ 17 In response to a series of questions from the court, Means testified that he had prepared the affidavit and confirmed that the mother had made the statements which were set forth in the affidavit. The court's questions and Means' answers were as follows:

"Q. Mr. Means, you prepared an affidavit document of the efforts made during this investigation; is that right?

A. Yes, sir.

Q. And did you include in the affidavit that the mother said that she popped him in the chest, but not the stomach?

A. Yes, sir.

Q. And did she say that she doesn't want [Z.B.] anymore and was going to drop him off at the fire department?

A. Yes, sir.

Q. And that school officials pushed her to go to parenting classes, but she said that she needs more services as [Z.B.] is a trigger for her as she will often lash out at him?

A. Yes, sir.

Q. She stated she is tired and wanted him gone so she can get on with her life?

A. Yes, sir.

Q. And when school officials stated that [Z.B.] didn't ask to be here, the mother said quote, "yes, I know and I regret my mistake everyday."

A. Yes, sir.

Q. And the mother also said she has no energy or capacity to care for [Z.B.] And she is afraid of what might happen to him if she continues to care for him?

A: Yes, sir."

The mother did not object to the court's questions and did not further cross-examine Means. The parties rested.

¶ 18    At the conclusion of the hearing, the court orally found that Z.B. was neglected based on an injurious environment, the father was noncustodial and the mother was the perpetrator. The court declined to find abuse or neglect based on a lack of necessary care or substantial risk of injury. In reaching the finding of neglect, the court discussed the evidence, referring to the "938 pages" of the records from Streamwood and Z.B.'s hospitalizations in April 2023 and February 2024. The court also noted the testimony of Means that the mother had admitted to "popping [Z.B.] in the chest," had said "she regret[ted] the mistake of having the child," and "was afraid of what might happen to the child if she continued to care for him." The court concluded that the State had

met its burden of neglect due to an injurious environment and remarked that a parent has a duty to ensure a safe and nurturing shelter for their children.

¶ 19     The court then proceeded to a disposition hearing. Susan Pinto, a DCFS case worker supervisor, who supervised Z.B's matter, was the only witness to testify.

¶ 20     Pinto testified that Z.B. has been in the home of the grandmother throughout the case. With the grandmother, Z.B. has a safe and appropriate environment, there has been no abuse, neglect or risk of harm, and no unusual incidents. Z.B. has been diagnosed with ADHD and dysregulation disorder. He receives therapy to address behavioral issues and there has been progress. Z.B. sees a psychiatrist and is on medication. Z.B. has an individualized education program at school and receives one-on-one daily instruction, which has been beneficial.

¶ 21     The mother was referred to parenting training, individual therapy, and anger management services. She has completed parenting classes, is waiting for an intake appointment for individual therapy, and has not begun an anger management program. The mother has weekly visits with Z.B., supervised by the grandmother; there have been no concerns with the visits. To achieve unsupervised visitation, the mother needs to engage in individual therapy.

¶ 22     Pinto testified that based on a staffing meeting, DCFS was recommending that Z.B. be made a ward of the court with a permanency goal of return home within 12 months.

¶ 23     The court then noted that, according to the affidavit, the mother was diagnosed with a mood disorder and obsessive-compulsive disorder in 2021, had issues with compliance with her medication, and was not then engaged in mental health treatment. The court asked Pinto if a referral to a mental health, psychological or psychiatric assessment was "on the radar" for the mother. The following discussion between the court and Pinto then took place:

"[PINTO]: Okay, I am glad you asked and brought that to my attention.

THE COURT: I believe [the mother] has mental health issues with no support system.

[PINTO]: So yes, no in regards to her mental health the only assigned task is to have her engage in individual therapy. There is nothing outside of that.

Not that we can't add something outside of that, but as of right now in her service plan according to the integrated assessment there is nothing asking for anything outside of individual therapy.

THE COURT: I'm going to enter an order amending the service plan today to include a mental health assessment for [the mother].

[PINTO]: Okay I will add that to the service plan."

The mother did not object to the court's questions and did not further examine Pinto. The parties rested.

¶ 24    At the conclusion of the disposition hearing, the court orally found that it was in the best interest of Z.B. that he be adjudged a ward of the court. The court entered several orders. In an adjudication order, the court found Z.B. was neglected based on an injurious environment. In a disposition order, the court found that it was in the best interest of Z.B. to be adjudged a ward of the court and the mother was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Z.B. and placed him in the guardianship of DCFS. In a permanency order, the court set a goal of return home within 12 months and provided that a mental health assessment was an additional required service. The mother has appealed.

¶ 25    On appeal, the mother argues that the circuit court committed plain error, at the adjudication hearing, when it questioned Means about the affidavit, which was never admitted into evidence. In the alternative, the mother argues that her counsel was ineffective, at the adjudication

hearing, for not objecting to the court's examination of Means about the affidavit, and at the disposition hearing for not objecting to the court's examination of Pinto about the affidavit. The mother then argues that whether this court reviews the alleged errors under the plain error doctrine or under ineffectiveness of counsel, the circuit court orders should be reversed because the circuit court committed "*per se* reversible error" in questioning Means at the adjudication hearing and Pinto at the disposition hearing.

¶ 26    The Act (705 ILCS 405/1-1 *et seq.* (West 2022)) provides a "step-by-step process used to decide whether a child should be removed from his or her parents and made a ward of the court." *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court conducts an adjudication hearing to determine whether the minor is abused, neglected, or dependent. *Id.*; 705 ILCS 405/1-3(1), 2-21(1) (West 2022). The State has the burden to prove allegations of abuse, neglect, or dependence by a preponderance of the evidence, that is, that the allegations are "more probably true than not." *In re A.P.*, 2012 IL 113875, ¶ 17. We will not reverse a finding of neglect unless it is against the manifest weight of the evidence (*id.*), i.e. where "the opposite conclusion is clearly evident" or "the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 27    If the circuit court makes a finding of abuse, neglect, or dependence, it then conducts a dispositional hearing to determine whether it is in the best interest of the minor and the public that the minor be made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 60; 705 ILCS 405/2-22(1) (West 2022). The disposition may include committing the minor to the care of DCFS if the court makes a finding that the parents are unable for reasons other than financial circumstances alone to care for or protect the minor. *In re Avery F.*, 2024 IL App (1st) 231089, ¶ 50 (citing 705 ILCS

405/2-27(1) (West 2022)). The State bears the burden of proving the inability to parent by a preponderance of the evidence. *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. We will not reverse a circuit court's dispositional determination unless it is against the manifest weight of the evidence or the court abused its discretion by selecting an inappropriate dispositional order. *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30.

¶ 28    Here, after the adjudication hearing, the circuit court found that Z.B. was neglected due to an injurious environment. After the disposition hearing, the circuit court found that the mother was unable to care for, protect, train, or discipline Z.B. and that it was in Z.B.'s best interest that he be made a ward of the court and placed him in the guardianship of DCFS and set a goal of return home within 12 months. The mother does not argue that the court's findings were against the manifest weight of the evidence or that the court abused its discretion in setting a goal of return home within 12 months. Instead, she asks this court to reverse the orders and remand for new adjudication and disposition hearings based on the court's questioning of Means and Pinto. As the mother acknowledges, this issue has been forfeited for her failure to object. See *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 112 (citing *In re M.W.*, 232 Ill. 2d 408, 430 (2009) (stating that forfeiture principles requiring an objection to preserve an error applies to proceedings under the Act)). The mother seeks review under the plain error doctrine or ineffectiveness of counsel.

¶ 29    A forfeited issue may be reviewed under the plain error doctrine when: (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v.*

*Piatkowski*, 225 Ill.2d 551, 565 (2007). We must first determine whether a clear or obvious error occurred. *Matter of Chance H.*, 2019 IL App (1st) 180053, ¶ 48.

¶ 30 Initially, we consider the mother's arguments as to the circuit court's examination of Means, at the adjudication hearing under the plain error doctrine. She maintains that in examining Means about the affidavit, which was not admitted into evidence, the court committed clear and obvious error by "circumventing the rules of evidence" and basing its decision, in part, on evidence that was never admitted as part of the record, violating the mother's right to due process by preventing her from cross examining as to the affidavit, and abandoning its role as a neutral arbitrator when it questioned Means "about admissions by [the mother] pertaining to her abuse and/or neglect of *** Z.B." We disagree.

¶ 31 The rules of evidence apply at an adjudication hearing. 705 ILCS 405/2-18(1) (West 2022) *In re A.U.*, 2024 IL App (1st) 231727, ¶¶ 63-64. The Illinois Rules of Evidence provide that in any adversarial proceeding, a circuit court may interrogate witnesses, whether called by itself or a party. Ill. R. Evid. 614(b) (West 2022). Generally, a circuit court has the authority "to question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 (citing *Obernauf v. Haberstitch*, 145 Ill. App. 3d (1986)). In all proceedings under the Act, the court has the authority to "direct the course" of the proceedings to promptly and fully gather information bearing on the child's current condition and future welfare. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 35 (citing 705 ILCS 405/1-2(2) (West 2018)). "Thus, under the [Act], 'unlike its customary role in civil or criminal proceedings, the court cannot sit passively and await the parties' presentation of evidence. Instead, the [A]ct requires that it must act affirmatively, and perhaps aggressively, to ferret out information

before it can decide that a child's best interest is better served by removal from the family.' " *In re N.T.*, 2015 IL App (1st) 142391, ¶ 42 (quoting *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991)).

¶ 32     In a bench trial, a circuit court is given more latitude, where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder. *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26. In doing so, the circuit court must not depart from its function as a judge and may not assume the role as an advocate for either party. *Id.* "The propriety of an examination of a witness by the [circuit] court must be determined by the circumstances of each case and rests within the discretion of the [circuit] court." *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000). "A court abuses its discretion when it adopts the role of the advocate for one of the parties and prejudices the opposing party." *Zoey L.*, 2021 IL App (1st) 210063, ¶ 36. To show prejudice in a bench trial, the aggrieved party must show that the circuit court's questioning indicates that the circuit court has prejudged the outcome before hearing all of the evidence. *Id.*

¶ 33     After Means testified as to his investigation and confirmed for the court that he had prepared the affidavit as part of that investigation, the circuit court asked him six questions that sought to clarify Means' testimony as to his investigation of the October 2023 incident. The court asked Means whether the mother claimed that she "popped" Z.B. in the chest, rather than the stomach, which Means affirmed. Means had already testified that Z.B. reported that the mother had punched him and that the mother acknowledged that she hit Z.B. The court further questioned whether the mother told Means that she was tired and had no energy and capacity to care for Z.B., wanted him gone and to drop Z.B. at the fire department, which Means affirmed. Means had already testified that the mother had told him that she "was getting tired" and "wanted to give Z.B. up." The court limited its questions to the specific contents of the affidavit and sought only to determine if the information in the affidavit was true. The court did not seek testimony from Means

about facts not previously disclosed and did not ask Means to comment or elaborate further on the contents of the affidavit. We do not find that the court abused its discretion. As discussed above, the Act and FRE allow the circuit court to direct the course of the proceedings to promptly and fully gather information bearing on the child's current condition and future welfare and may do so by interrogating witnesses.

¶ 34    And the court did not commit error in basing its questions on the affidavit which was not formally introduced into evidence. Means confirmed that he prepared the affidavit as part of his investigation of the October 2023 incident. The affidavit was filed with the circuit court in support of the petition and the motion for temporary custody. The mother has never questioned the authenticity or reliability of the affidavit or asserted that she had no prior knowledge of the contents of the affidavit. Means was competent to provide testimony as to the information in the affidavit to shed further light on the material issues.

¶ 35    Further, the court did not abandon its role as a neutral arbiter and take on the role of the prosecutor. The circuit court's line of questioning was short and based on testimony already provided by Means. The court was seeking to clarify Means' prior testimony as to his investigation of the October 2023 incident. Again, the court, in juvenile cases, can interrogate witnesses "to question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26.

¶ 36    Finally, we reject the mother's argument that her due process rights were violated. The mother had notice of the affidavit as it was filed with the petition and supported the factual allegations within the petition. The affidavit was consistent with Means' testimony at the adjudication hearing. The court provided the mother with the opportunity to ask follow-up

questions of Means and the mother had the right to present testimony and other evidence at the hearing to contradict Means' testimony as to the affidavit.

¶ 37    We conclude that there was no clear or obvious error made by the circuit court. As a result, there was no plain error in the court's examination of Means.

¶ 38    We next turn to whether the mother was denied effective assistance of counsel, at the adjudication hearing or the disposition hearing, where her attorney did not object to the circuit court's questioning of Means at the adjudication hearing and Pinto at the disposition hearing.

¶ 39    A parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705 ILCS 405/1-5(1) (West 2022); *In re Ca. B*, 2019 IL App (1st) 181024, ¶ 41. We apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), in reviewing a parent's claim of ineffective assistance of counsel in a proceeding to terminate parental rights. *Ca. B*, 2019 IL App (1st) 181024, ¶ 42. Under *Strickland*, a parent must show that counsel's performance fell below an objective standard of reasonableness and that, but for the error, a reasonable probability exists that the result of the proceeding would have been different. *Id.* (citing *Strickland*, 466 U.S. at 687-88). Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 40    As discussed above, the circuit court's questioning of Means at the adjudication hearing was appropriate, and therefore the mother's counsel would have had no reason to object. See *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 38 (Trial counsel's decision not to object is presumptively a matter of sound trial strategy, which we afford great deference.)

¶ 41    Next, we review whether the mother's counsel was ineffective at the disposition hearing for failing to object to the circuit court's questioning of Pinto. The mother argues that her counsel

was ineffective at the disposition hearing "for the same reason that [her counsel] at the adjudication was ineffective." Again, we disagree.

¶ 42    At the disposition hearing, Pinto testified as to the mother's recommended services including parenting classes, individual therapy, and anger management. Pinto further testified that the mother had completed parenting classes. The mother had not completed individual therapy or anger management. In response, the circuit court noted, from the affidavit that was attached to the petition and motion for temporary custody, that the mother had prior mental health diagnoses and had been prescribed medications. Pinto confirmed that the service plan contained only a recommendation that the mother participate in individual therapy, but that additional recommendations could be made. The court then stated that it would enter an order directing that a mental health assessment be part of the mother's recommended services.

¶ 43    A material issue at the disposition hearing was whether there were available services which would aid in reunification and assure the well-being of Z.B. The circuit court sought to clarify whether a mental health assessment was contemplated by DCFS based on the mother's history as set forth in the affidavit and the recommendation that she engage in individual therapy. In asking Pinto questions about a mental health assessment for the mother, the court was properly directing the course of the proceedings to shed light on a material issue and to discover pertinent information before deciding whether it was in Z.B.'s best interest that he be made a ward of the court and setting an appropriate disposition. See *In re N.T.*, 2015 IL App (1st) 142391, ¶ 42 (quoting *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991) (" 'the [A]ct requires that [the circuit court] must act affirmatively, and perhaps aggressively, to ferret out information before it can decide that a child's best interest is better served by removal from the family' ")).

¶ 44 Additionally, the court did not err in asking pertinent questions based on the affidavit which had not been admitted into the record. The rules of evidence are relaxed at a disposition hearing and all probative evidence, including hearsay, is admissible. *A.U.*, 2024 IL App (1st) 231727, ¶¶ 64-65; 705 ILCS 405/2-22(1) (West 2022). Therefore, the circuit court's questioning of Pinto was appropriate, just as at the adjudication hearing, we do not find that the mother's counsel was ineffective for failing to object.

¶ 45 Lastly, the mother, citing *People v. Moriarity*, 33 Ill. 2d 606 (1966) and *People v. Jackson*, 409 Ill. App. 3d 631 (2011), argues that the circuit court committed "*per se* reversible error" when it relied on its personal knowledge to examine Means. These cases do not support a finding that *per se* reversible error occurred.

¶ 46 In *Moriarity*, our supreme court held that the circuit court, in a jury trial, took on the role of the prosecutor in its examination of the witnesses. 33 Ill. 2d at 613. The circuit court, in front of the jury, interrupted and took over the questioning of each witness that identified defendant and emphasized that identification. *Id.* In one instance, when the prosecutor fell short in examining the complaining witness, the court "intervened and asked the critical question" and in other instances supplied objections to the questions asked. *Id.*

¶ 47 In *Jackson*, the defendant was found guilty of first degree murder but mentally ill after a bench trial where he had raised an insanity defense and presented an expert witness in forensic psychology. 409 Ill. App. 3d at 631. On appeal, this court, in finding plain error, held that the circuit court took on the role of the prosecutor in its examination of the defendant's expert witness. *Id.* at 647-48. We found that the circuit court's questions were "more similar to a cross-examining prosecutor than an impartial jurist." *Id.* at 648. The majority of the questions "were not to 'elicit truth' or 'to bring enlightenment on material issues which seem obscure,' but rather were

argumentative and hostile." *Id.* at 649. The circuit court also "constantly interrupted [the witness], contradicting or questioning many of his answers," (i*d.* at 648) and improperly relied on personal knowledge when it questioned the expert witness about the defendant's medication and IQ (*id.* at 649-50).

¶ 48    Both *Jackson* and *Moriarity* were criminal cases and were not governed by the Act, which provides that the circuit court must direct the course of proceedings and to act affirmatively in discovering the information. In *Moriarity*, the court's examination of the witnesses took place in front of a jury, instead of during a bench trial, as the case here. And, as discussed above, the circuit court's examinations of Means and Pinto were brief. The circuit court did not interrupt or contradict the answers of Means or Pinto, but asked questions to clarify their prior testimony with information that was gleaned from the affidavit which had been filed with the petition and motion for temporary custody, not information based on the circuit court's private knowledge. We find that neither of these cases are applicable to the facts and circumstances of the instant case and the mother has failed to show that the circuit court committed "*per se* reversible error."

¶ 49    For these reasons, we find that the mother did not establish that the circuit court committed plain or *per se* reversible error or that her counsel was ineffective at the adjudication or disposition hearings. We affirm the adjudication and disposition orders of the circuit court.

¶ 50    Affirmed.