2024 IL App (1st) 231727-U
No. 1-23-1727

FIRST DIVISION
April 15, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | Appeal from the Circuit Court |
| A.U., | ) | of Cook County, Illinois, |
| | ) | Child Protection Division |
| Minor-Respondent-Appellee | ) | |
| | ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | No. 22JA00927 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.D.-U., | ) | The Honorable |
| | ) | Peter J. Vilkelis, |
| Respondent-Appellant.) | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the circuit court's adjudication order finding that respondent's minor child was neglected due to an injurious environment, as well as the subsequent dispositional order finding that respondent was unable and unfit to parent the minor.

¶ 2     Respondent-Appellant A.D.-U. ("respondent") appeals from the circuit court's adjudication order finding her child, minor-respondent-appellee A.U., neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of 1987 ("Act"). 705 ILCS

405/2-3(1)(b) (West 2022). Respondent further appeals from the subsequent August 24, 2023 disposition order that adjudged A.U. a ward of the court and found respondent unfit and unable to care for the minor. For the following reasons, we affirm the circuit court's orders.

¶ 3                                          BACKGROUND

¶ 4      Respondent gave birth to A.U., a boy, on November 22, 2022. The record reflects that A.U. lived with respondent and his father, S.U., since shortly after birth. S.U. is not a party to this appeal but was represented in the proceedings below.

¶ 5      The record also reflects that respondent had two older minor children, who did not live in the same home with A.U. and respondent.[1] Those children were subject to separate proceedings under the Act.

¶ 6      On December 19, 2022, the State filed a petition for adjudication of wardship alleging that A.U. was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2022)) and alleging that he was abused due to a substantial risk of injury (*id.* §2-3(2)(ii). In its petition, the State alleged as follows:

> "Natural mother has one prior indicated report for inadequate
> supervision and substantial risk of physical injury/environment
> injurious to welfare. Natural mother has two other minors in DCFS
> guardianship with findings of abuse and neglect having been
> entered. Natural mother has been non-compliant with services
> geared towards reunification with those minors and has not been
> determined safe for unsupervised visitation with those minors.
> Natural mother was uncooperative with DCFS efforts to assess the

---

[1] The record reflects that respondent's two older children were fathered by men other than S.U.

safety of [A.U.] after birth. Legal father resides with mother and has

not made himself available to be assessed as a caregiver for [A.U.].

Paternity has not been established."[2]

Also on December 19, 2022, the State separately moved for temporary custody of A.U.

¶ 7    The following day, the circuit court held an evidentiary temporary custody hearing and found probable cause that A.U. had been abused and neglected. However, the court found no immediate and urgent necessity to support removal from the home. Thus, the December 20, 2022 temporary custody hearing order stated that A.U. would remain in the custody of respondent and S.U., subject to an order of protection. The corresponding December 2022 order of protection specified numerous conditions. Among these, respondent and S.U. were required to "cooperate with all reasonable requests of DCFS", "attend and complete parenting skills classes, if required by DCFS", refrain from illegal drug use, and "participate in a (substance abuse/psychological/psychiatric) assessment and cooperate with all reasonable recommendations."[3]

¶ 8                              The Adjudication Hearing and Stipulation

---

[2] In December 2022, the court entered a finding establishing S.U.'s paternity.

[3] The order required respondent and S.U. to: provide all care, including medical care, necessary for the minor; cooperate with all reasonable DCFS requests; insure the appropriate supervision of the minor at all times; insure at all times an appropriate care plan for the minor with an appropriate person who has agreed to take care of him; sign all releases of information or referrals made; attend parenting skill classes if required by DCFS; notify DCFS prior to any change of residence; make the minor available to his attorney and GAL upon reasonable request; not use or allow anyone to use any corporal punishment on the minor; provide samples for random drug screens if requested; participate in any substance abuse, psychological, or psychiatric assessments and cooperate with all reasonable recommendations; cooperate with the assessment of the special needs of the minor and follow all reasonable recommendations; insure the minor attends all necessary medical appointments and follow all medical instructions for his care; refrain from using or possessing illegal substances; notify DCFS within 24 hours of any injury to the minor that would require professional medical treatment; insure that school-age minors attend school daily; and attend appropriate sex abuse and family substance abuse counseling and follow all recommendations.

¶ 9    The adjudication hearing took place on April 26, 2023, with the parties agreeing to proceed by way of a written stipulation that was entered into evidence.[4]

¶ 10    The stipulation provided that, if called to testify, Delilah Butler would state she is a Department of Children and Family Services (DCFS) caseworker assigned to respondent's two older minor children. Butler would state that, at the time of A.U.'s birth, respondent was in need of reunification services in order to safely reunite with her two older minors, including individual therapy, parenting services, a psychiatric evaluation, a substance abuse assessment, domestic violence services, and family therapy. Respondent had been engaged in individual therapy but stopped attending in August of 2022. As of A.U.'s birth in November 2022, respondent had not participated in any other reunification services.

¶ 11    Butler would further testify that, as of the time of A.U.'s birth, she did not recommend respondent have unsupervised contact with her two older children. Butler would also testify that respondent had initially refused to tell Butler where A.U. was located. Butler did not make contact with respondent and A.U. until December 16, 2022, when Butler saw them in respondent's home.

¶ 12    Apart from the stipulated testimony, the parties also stipulated to the admission of adjudication and disposition orders entered in cases 21 J.A. 279 and 21 J.A. 280, which concerned respondent's two older children. Specifically, adjudication orders entered in March 2022 found those two children were neglected due to an injurious environment and due to being left without supervision for an unreasonable period of time (705 ILCS 405/2-3(1)(b),(d) (West 2022) and that they were abused due to a substantial risk of physical injury (*id*. § 2-3(2)(ii)). Those adjudication orders included factual findings that the two children were left home alone overnight on a regular basis, that one of them expressed suicidal ideations with thoughts of using a knife at school, and

_____

[4] Whereas Hon. Patrick T. Murphy entered the December 2022 temporary custody order and order of protection, Hon. Peter J. Vilkelis presided over the subsequent adjudication and disposition proceedings.

that respondent had untreated mental health issues. The May 2022 disposition orders adjudged the children wards of the court, after the court found that respondent and the children's fathers were unable for some reason other than financial circumstances alone to care for, protect, train, or discipline them.

¶ 13                    Counsel's Argument and Finding of Neglect for A.U.

¶ 14    Following the stipulation and admission of the orders from the older children's cases, the State argued it had met its burden to show that A.U. was (1) neglected due to an injurious environment and (2) abused due to a substantial risk of injury. The Public Guardian joined in the State's argument.

¶ 15    Respondent's counsel did not dispute that a finding of neglect was warranted but asked the court not to make a finding of abuse. Specifically, her counsel argued:

> "I would ask your Honor reserve his findings to N.E.I. [neglect due
>
> to injurious environment] only as this is an add on sibling for
>
> mother's prior child protection cases. The minor is home and there
>
> is nothing to indicate in the stipulation that was read into the record
>
> that the minor was ever abused while in the presence of
>
> [respondent.]"

Counsel for A.U.'s father joined in respondent's argument, commenting that "the allegations support N.E.I." but that the facts of the case "don't support the abuse substantial risk allegation."

¶ 16    The circuit court then found that the evidence was "more than sufficient" to support neglect due to injurious environment, naming respondent as the perpetrator of the neglect. Noting that a different judge had entered the December 2022 order allowing A.U. to remain home subject to an order of protection, the circuit court requested that the terms of that order of protection be read

into the record. After the conditions of the order or protection were recited, the court indicated that it would assess whether the conditions were being followed at the eventual dispositional hearing. The court also indicated that if A.U.'s parents did not comply with those conditions, it could vacate the order of protection and remove A.U. from their custody.

¶ 17                              The Dispositional Hearing

¶ 18    The record reflects that the dispositional hearing occurred on August 24, 2023, in conjunction with the court receiving a progress report regarding respondent's two older children.

¶ 19    The State called DCFS caseworker Butler as a witness. Butler testified that she had been A.U.'s caseworker since his birth approximately nine months earlier, and that he remained at home with his parents. Butler stated that A.U. was in need of a "0 to 3 developmental screening" to "see if he is developmentally on track."

¶ 20    Butler testified that she had last seen A.U. within the last 30 days, when respondent brought A.U. to one of respondent's visits with one of the older children. That visit was not at respondent's home. Butler testified that she was last in respondent's home near the end of June 2023. Butler stated that the home was a safe and appropriate environment for A.U., that there were no signs of abuse or neglect, and that there had been no unusual incidents while A.U. lived with his parents.

¶ 21    Upon further questioning by the State, Butler testified that it had been "difficult to talk to Mom [respondent] regarding services" for A.U., and that she usually spoke with A.U.'s pediatrician. When the court asked Butler to explain further, Butler testified that she "usually call[ed] the pediatrician to get updates" on A.U. She said that it was easier to speak to the pediatrician because when Butler went to the home, respondent typically "does not answer my questions" and usually asked Butler to leave after about five or ten minutes. Butler stated she had made monthly visits to the home until her last visit in June 2023, when it took respondent "twenty

minutes to answer the door," but "eventually we were able to get into the home." According to Butler, A.U.'s pediatrician did not express any concerns. Butler also stated that she spoke with A.U.'s father, and that he did not report any concerns.

¶ 22    Butler further testified that DCFS had assessed respondent and found that she needed the following services: individual therapy, parenting classes, psychiatric services, substance abuse services, domestic violence services, and a psychological evaluation. According to Butler, respondent had completed parenting classes, and she was participating in individual therapy and psychiatric services through "Ark Angels."[5]

¶ 23    The transcript reflects that at one point during Butler's testimony on direct examination, the court referenced a report (that was not in evidence) and used it to ask Butler the following questions:

> "THE COURT: I am reading the court report that was tendered and it says that respondent is currently receiving individual therapy through Ark Angels. [Respondent] is making little or no progress. The therapist is recommending an updated psychiatric and psychological, is that accurate, Ms. Butler?
>
> THE WITNESS: That is correct.
>
> THE COURT: And Mom refused to participate in domestic violence services?
>
> THE WITNESS: That is correct.
>
> THE COURT: According to this court report substance abuse services she refused to answer questions about drug use.
>
> THE WITNESS: That is correct."

---

[5] It appears likely that the actual name of the referenced service provider was "Arch Angels," although the record does not contain corresponding documentation.

¶ 24   Respondent's counsel raised no objection to the court's questions, after which the State continued with its direct examination.

¶ 25   Butler proceeded to testify that she was in e-mail contact with respondent's therapist from Ark Angels, but that respondent would not communicate with Butler directly. Butler again testified that respondent was going to therapy but not making progress. Butler was also in contact with respondent's psychiatric service providers, who said she was attending psychiatric services and taking medication.

¶ 26   The State asked Butler how she knew that respondent refused domestic violence services. Butler answered:

> "We had a child and family team meeting * * * five or six months
> ago and I had provided [respondent] with Sarah's Inn information.
> And she stated that she called a different location which is called
> HAAS. And she stated that she called and they did not have an
> assessment for domestic violence. But because I was not aware of
> the HAAS Program I called them myself and I did have an
> assessment for HAAS. So I did email [respondent] on the
> information.
>
> And we also had a child and family meeting in order for us
> to give her that information, but she refused to participate in the
> child and family meeting."

¶ 27   The State separately asked Butler how she knew that respondent "refused to answer questions" about substance abuse. Butler answered: "It is stated in the therapy report by Ark

Angels that I submitted." As no such report is in the record on appeal, it is not clear whether Butler was referring to the same report that the court referenced in its prior questions to her.

¶ 28    Butler further testified that respondent was A.U.'s primary caretaker during the daytime, while S.U. worked. Butler had spoken with S.U. and saw him interact with A.U. Butler did not have any concerns about S.U. and did not believe he needed services.

¶ 29    Butler reported that she and her supervisor did not recommend that A.U. be made a ward of the court. Rather, they recommended that the order of protection remain in place so they could "continue to monitor [A.U.]'s care" while he stayed in his parents' home. On cross-examination by respondent's counsel, Butler agreed that the agency believed that this would be in A.U.'s best interest.

¶ 30    Following Butler's testimony, the court remarked that the order of protection "has clearly been violated" and asked the Public Guardian for its position. The Public Guardian requested removal of A.U. from the home "until [respondent] gets into services", noting she had not complied with the order of protection. The State agreed that A.U. should be removed from the home.

¶ 31    Respondent's counsel argued that it would not be in A.U.'s best interest to remove him, noting his very young age and that he had lived with respondent since birth. Counsel also noted that Butler did not recommend removal, and that A.U.'s pediatrician had no concerns. Respondent's counsel acknowledged that the order of protection had been violated but asked that it not be vacated so that A.U. could remain in the care of his mother. Counsel for A.U.'s father also argued that A.U. should be able to stay in the home under the order of protection.

¶ 32    The court proceeded to adjudge A.U. a ward of the court. In its ruling, the court commented that perhaps respondent believed that because the court previously allowed A.U. to stay in her home subject to the order of protection, "everything was cool and she doesn't have to do anything,"

but the order of protection "clearly has been violated." The court noted that respondent "asks the caseworker to leave" and refused to talk to her, refused to attend a child and family team meeting, and refused to answer questions about drug use. The court also noted that respondent was the only parent home during the day. The court said it was "struggling with what is the right thing to do" because to "remove the child is traumatic." However, it remarked that it could "not, in good conscience, allow the order of protection to remain in place based on the violations that have occurred." It recognized that Butler did not recommend removal, but it did not "think that [A.U.] is safe while in the care of his mother while his Dad is at work."

¶ 33    Thus, on August 24, 2023, the court vacated the order of protection and entered a disposition order adjudging A.U. a ward of the court and placing him in the guardianship of the DCFS guardianship administrator with the right to place the minor. In that order, the court found that respondent was unable for some reason other than financial circumstances to care for, protect, train and discipline A.U.; the order also found that she was unfit. In the same order, the court also found that S.U. was unable to care for A.U.

¶ 34    Respondent filed a notice of appeal in the trial court on September 26, 2023, which was not timely. On October 13, 2023, respondent moved for leave to file a late notice of appeal pursuant to Supreme Court Rule 303(d) (eff. July 1, 2017). This court granted that motion. Thus, we may consider respondent's appeal from the adjudication and dispositional orders.

¶ 35                             ANALYSIS

¶ 36    Respondent asserts three arguments, one directed to her counsel's conduct at the adjudication hearing, and the other two related to the dispositional hearing. First, she contends her trial counsel was ineffective by "arguing for a finding of neglect when the evidence presented did not support" findings of abuse or neglect. Second, she asserts that the trial court committed plain

error and violated her due process rights when it used a report not in evidence to question Butler, and "relied on the information in the report" to make its dispositional ruling. Finally, she asserts that the findings that she was unfit and unable are against the manifest weight of the evidence.

¶ 37    Proceedings Under the Juvenile Court Act

¶ 38    Before we reach the merits of respondent's claims, we briefly review the procedures under the Act. Under the Act, the trial court employs a "two-step process" in determining whether a minor should be removed from parental custody and made a ward of the court. *In re Z.L.*, 2021 IL 126931 at ¶ 58. The first step is the adjudicatory hearing, at which "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2022). "The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.* at 463.

¶ 39    At the adjudicatory hearing, it is the State's "burden to prove allegations of abuse or neglect by a preponderance of the evidence," that is, whether the allegations are more probably true than not. *In re Z.L.*, 2021 IL 126931 at ¶ 61. We will not disturb the trial court's finding of abuse or neglect unless the decision is against the manifest weight of the evidence. *In re K.F.*, 2024 IL App (1st ) 231018, ¶ 53. A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *Id.* (quoting *In re Z.L.*, 2021 IL 126931, ¶ 61). "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *In re V.S.,* 2023 IL App (1st) 220817, ¶ 64.

¶ 40    "If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing." *In re Z.L.*, 2021 IL 126931,

¶ 60 (citing 705 ILCS 405/2-21(2) (West 2018)). At the dispositional hearing, the court determines "whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *Id.* The court "may adjudge the minor a ward of the court and commit the minor to the custody of a third party, such as DCFS, if it finds that 'the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so' and that 'the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *In re K.F.*, 2024 IL App (1st) 231018, ¶ 68 (quoting *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63).

¶ 41    We will reverse a trial court's dispositional determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re V.S.*, 2023 IL App (1st) 220817, ¶ 64.

¶ 42    <u>Ineffective Assistance Claim</u>

¶ 43    We turn to respondent's claim that she received ineffective assistance of counsel at the adjudication hearing. Our supreme court has explained that "[w]hile the sixth and fourteenth amendments to the United States Constitution [citation] and article I, section 8, of the Illinois Constitution of 1970 [citation] guarantee the right to counsel in criminal proceedings, the right to counsel in proceedings under the Juvenile Court Act is provided by statute." *In re Br. M.,* 2021 IL 125969, ¶ 41. By statute, parents of a minor who is the subject of proceedings under the Juvenile Court Act "have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, * * * and also, although proceedings under the Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2022).

¶ 44    Although the "statutory right to counsel in proceedings under the Juvenile Court Act lacks constitutional footing [citations] that right is closely linked to its constitutional counterpart." *In re Br. M.*, 2021 IL 125969, ¶ 42. Accordingly, our supreme court has indicated that the two-prong standard from *Strickland v. Washington*, 466 U.S. 668 (1984) guides the determination of whether counsel was effective in proceedings under the Act. See *In re Br. M.*, 2021 IL 125969, ¶ 43 ("We recognize that there are differences between criminal law proceedings and proceedings under the Juvenile Court Act, but the *Strickland* standard, because of its familiarity and simplicity, offers a helpful structure to guide our analysis.").

¶ 45    Under the *Strickland* standard, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cherry*, 2016 IL 118728, ¶ 24 (citing *Strickland*, 466 U.S. at 687). Stated differently, "a defendant must demonstrate that his attorney's representation fell below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" *People v. Peterson*, 2017 IL 120331, ¶ 79. A "reasonable probability" means a "probability sufficient to undermine confidence in the outcome" of the proceeding. *Id*. The failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance. *Id*. That is, "when a party cannot establish prejudice under *Strickland*, we may dispose of an ineffective assistance claim on this basis and need not consider whether counsel's performance was deficient." *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 37.

¶ 46    In this appeal, respondent asserts that her counsel was ineffective under the two-prong *Strickland* test. She claims that her counsel was deficient by "argu[ing] that the trial court should make a finding of neglect due to injurious environment," which "essentially allied her with the

prosecution against [respondent]." She avers that "[a]sking the trial court to make a finding against one's own client is an objectively unreasonable error," especially since "the evidence presented did not support any findings of abuse or neglect."

¶ 47    We disagree. Notably, we point out that respondent's contention is limited to her counsel's argument at the adjudication hearing, after the stipulation was read into the record. Specifically, she faults her counsel for stating:

> "I would ask your Honor reserve his findings to N.E.I. [neglect due
> to injurious environment] only as this is an add on sibling for
> mother's prior child protection cases. The minor is home and there
> is nothing to indicate in the stipulation that was read into the record
> that the minor was ever abused while in the presence of
> [respondent.]"

That is, her counsel did not dispute that there were grounds for a finding of neglect, but argued the evidence did not support a finding of abuse.

¶ 48    Given the circumstances, we cannot say this was an objectively unreasonable approach, for purposes of the first prong of the *Strickland* standard. We keep in mind that to show deficient performance under the first prong, a "defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83 (citing *People v. Manning*, 241 Ill. 2d 319, 327 (2011)). Indeed, "strategic choices are virtually unchallengeable on appeal. [Citation.]" *Id*.

¶ 49    Here, the content of respondent's counsel's argument is properly viewed as a strategic decision entitled to deference. See *Sturgeon*, 2019 IL App (4th) 170035, ¶ 83 ("The content of a closing argument is generally a matter of trial strategy."). And although counsel conceded that

there was evidence supporting a finding of neglect for A.U., we cannot say this was an unreasonable decision, given the contents of the stipulation and the exhibits. We again note that respondent does not suggest that it was unreasonable for her counsel to enter into that stipulation.

¶ 50    In any event, even if we were to find that her counsel's concession regarding neglect constituted deficient performance, respondent cannot satisfy the prejudice prong of the *Strickland* standard. That is, respondent cannot establish that there was a reasonable probability that the court would not have made the finding of neglect, even had her counsel argued differently. This is because there was ample evidence supporting the finding of neglect due to injurious environment. See 705 ILCS 405/2-3)(1)(b) (West 2022) (defining those who are neglected to include a minor "whose environment is injurious to his or her welfare.")

¶ 51    " 'Neglect" is the failure to exercise the level of care that is demanded by the circumstances. [Citations.]" *In re L.S.*, 2022 IL App (1st) 210824, ¶ 127. It has a "fluid meaning that includes willful and intentional disregard of duty and varies based on the context of surrounding circumstances." *Id*. (citing *In re Arthur H.*, 212 Ill.2d at 463). Likewise, the term "injurious environment" is an "amorphous concept that cannot be defined with particularity." *In re Arthur H.*, 212 Ill.2d at 463. "In general, however, the term 'injurious environment' has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotations omitted.) *Id*.

¶ 52    Further, under the theory of "anticipatory neglect," the State may argue that past neglect or abuse of a sibling supports a finding of neglect due to injurious environment. See *id.* at 467 ("Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have

neglected or abused another child.).” The Act specifies that “proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible.” 705 ILCS 405/2-18(3) (West 2022).

¶ 53    Here, there was ample evidence supporting the finding of neglect due to injurious environment, given the contents of the stipulation and the evidence presented at the adjudication hearing. It was stipulated that DCFS caseworker Butler would testify that respondent was in need of additional services “in order to safely reunify” with her two older children; that Butler did not recommend that respondent have unsupervised visits siblings; and that respondent had refused to tell Butler where A.U. was located. In addition, the court considered the March 2022 adjudication orders finding A.U.’s two siblings were neglected and abused. Given that evidence, we cannot find any reasonable probability that the court would *not* have made a finding that A.U. was neglected, even had respondent’s counsel argued against it.

¶ 54    Accordingly, respondent cannot satisfy the prejudice prong of her ineffective assistance claim. We thus reject that challenge.

¶ 55    <u>Claim of Plain Error Based on Trial Court’s Use of a Report</u>

¶ 56    We turn to respondent’s contention that she was denied due process at the disposition hearing when the court referenced a report not admitted into evidence to question Butler, and then “relied on the information in the report to make its ruling.” She suggests that because the report “was never admitted into evidence” and was “not subject to cross-examination,” her due process rights were violated.

¶ 57    Respondent acknowledges that no party objected when the trial court referenced the report and asked Butler about it during her testimony. Nonetheless, respondent urges we should find there was plain error.

¶ 58    "We may review an unpreserved error under the plain error doctrine found in Illinois Supreme Court Rule 615(a) (Jan. 1, 1967), which provides a limited and narrow exception to the general rule of procedural default." *Matter of Chance H*., 2019 IL App (1st) 180053, ¶ 47. Rule 615(a) provides: "Any error * * * which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a).

¶ 59    While the plain-error doctrine is "most commonly applied to criminal proceedings, a parent's right to raise his or her biological child is a fundamental liberty interest, and ruling affecting that right may be reviewed for plain error. [Citations.]" *Matter of Chance H*., 2019 IL App (1st) 180053, ¶ 47. The doctrine "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Jones*, 2016 IL 119391, ¶10. The "initial analytical step under either prong of the plain error doctrine is [to] determine whether there was a clear or obvious error at trial." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 58 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 49).

¶ 60    Thus, we proceed to assess whether the court committed a clear or obvious error in referencing the report to question Butler.

¶ 61    The Court Did Not Commit a Clear and Obvious Error

¶ 62    Respondent's specific claim of error is that the report "was never admitted into evidence." She notes there was "no foundation laid for the report and no date provided for when the report was authored, by who or in what context." She also suggests her due process rights were violated because the report was not "subject to cross-examination" and the court relied on "information not admitted into evidence."

¶ 63    In their appellee briefs, the Public Guardian and the State argue that, given the relevant provisions of the Act, there was no error. For the following reasons, we agree.

¶ 64    "Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act and fundamental fairness." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Notably, the alleged error occurred at a dispositional hearing, rather than an adjudicatory hearing. This is significant because the Act sets forth different procedures and standards for different stages of proceedings. See *In re M.D.*, 2022 IL App (4th) 210288, ¶ 57 ("Each 'step' in the process (or type of hearing) is governed by different rules of evidence and concerns different legal issues.").

¶ 65    The Act specifies that at an adjudicatory hearing, "[t]he standard of proof and the rules of evidence in the nature of civil proceedings" apply. 705 ILCS 405/2-18(1) (West 2022). "However, the rules of evidence are substantially relaxed at a dispositional hearing held to determine if it is in the minor's and the public's best interests that the minor be made a ward of the court." *In re Ca. B.*, 2019 IL App (1st) 181025, ¶ 56.  Section 2-22(1) of the Act provides:

> "At the dispositional hearing, the court shall determine whether it is
> in the best interests of the minor and the public that he be made a
> ward of the court, and, if he is to be made a ward of the court, the
> court shall determine the proper dispositions best serving the health,

safety and interests of the minor and the public. * * * *All evidence*

*helpful in determining these questions, including oral and written*

*reports, may be admitted and may be relied upon to the extent of its*

*probative value, even though not competent for the purposes of the*

*adjudicatory hearing*." (Emphasis added). 705 ILCS 405/2-22(1)

(West 2022).

¶ 66    This court has interpreted this provision to indicate the legislature's intent " 'to give the trial court *wide latitude* in considering evidence that is relevant and helpful to the court's determination of a proper disposition.' " (Emphasis in original). *In re Ca. B.*, 2019 IL App (1st) 181025, ¶ 56 (quoting *In re April C*. 326, Ill. App. 3d 245, 261 (2001)). "Essentially, there are no rules of evidence governing what the court may receive and consider at the dispositional hearing." *In re M.D.*, 2022 IL App (4th) 210288, ¶ 63; see also *In re D.L.*, 226 Ill. App. 3d 177, 187 (1992) ("Although hearsay and other types of incompetent evidence may not be admissible at the adjudicatory hearing, they are admissible at the dispositional hearing. [Citations.]").

¶ 67    Further, section 2-22 of the Act specifically addresses the use of reports at a dispositional hearing and the parties' related rights:

"Before making an order of disposition the court shall advise the

State's Attorney, the parents, guardian, custodian or responsible

relative or their counsel of the factual contents and the conclusions

of the reports prepared for the use of the court and considered by it,

*and afford fair opportunity, if requested, to controvert them*. The

court may order, however, that the documents containing such

reports need not be submitted to inspection, or that sources of

> confidential information need not be disclosed except to the attorneys for the parties." (Emphasis added.) 705 ILCS 405/2-22 (West 2022).

¶ 68 Based on these authorities and the record before us, we do not find the trial court committed a "clear and obvious error", a necessary prerequisite to either prong of the plain-error doctrine. *Jones*, 2016 IL 119391, ¶ 10. That is, we do not find there was an error "affecting substantial rights" within the meaning of Rule 615(a).

¶ 69 The transcript of proceedings reflects that during the dispositional hearing, the trial court asked DCFS caseworker Butler to verify certain statements contained in a "court report" whose source was not clearly identified on the record.[6] Specifically, the court asked Butler to confirm that (1) respondent's therapist reported "little or no progress" in therapy and recommended an updated psychiatric assessment; (2) respondent refused to participate in domestic violence services; and (3) respondent "refused to answer questions about drug use." Although the report was not formally introduced or admitted into evidence, there is no question that the contents of the report could be admitted and relied upon by the court under section 2-22(1) of the Act. 705 ILCS 405/2-22(1) (West 2022). Moreover, the record reflects that the court did not simply accept the report's statements as true, but specifically questioned Butler as to their accuracy. That is, Butler provided independent testimony that corroborated the content of the statements in question. Respondent's counsel had a chance to cross-examine Butler regarding that testimony but elected not to do so.

---

[6] During the dispositional hearing, Butler referenced "the therapy report by Ark Angels that I submitted," although the record is insufficient for us to conclude if this is the very same report that the court referred to in its questions to Butler.

¶ 70    Further undermining her claim of a due process violation, we note that respondent does not allege that the report was unavailable to her counsel at the dispositional hearing.[7] As the Public Guardian's appellee brief points out, section 2-22(2) requires that parents or their counsel shall be advised of the contents and conclusions of court reports and "afford[ed] fair opportunity, if requested, to controvert them." 705 ILCS 405/2-22 (West 2022). There is nothing to suggest that respondent was deprived of that opportunity.

¶ 71    For these reasons, we find respondent has not satisfied the "initial burden" of showing a "clear or obvious" error, which precludes either prong of the plain-error doctrine.  See *Anaya*, 2017 IL App (1st) 150074, ¶ 59. We thus reject respondent's claim of error pertaining to the use of the report.

¶ 72    The Dispositional Findings Were Not Against the Manifest Weight of the Evidence

¶ 73    We turn to respondent's third argument, in which she urges that the dispositional order's findings were against the manifest weight of the evidence. She claims the evidence "overwhelmingly established [her] fitness and ability to care for A.U., as he had been cared for in the nine months preceding the hearing."

¶ 74    We keep in mind that "[a] trial court's dispositional order will be reversed only if the factual findings * * * are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 54. "A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.* Based on the record—including Butler's uncontroverted testimony that respondent

---

[7] Respondent's brief acknowledges "it is unclear from the record who had access to this report and what else it may have contained." She also acknowledges that "there is no indication that this report was confidential."

violated conditions and avoided contact with DCFS—we cannot say the findings were against the manifest weight of the evidence.

¶ 75    We note that respondent's argument is somewhat dependent on her prior argument regarding the use of the court report during Butler's testimony. In her opening brief, she suggests that because the report was not "admitted into evidence," "its contents (as selectively introduced into the record by the trial judge) should not be considered" in the dispositional ruling.

¶ 76    This is unconvincing. First, as discussed, the court could consider the report at a dispositional hearing, where the rules of evidence are "substantially relaxed." *In re Ca. B*., 2019 IL Ap (1st) 181024, ¶ 58. And even assuming *arguendo* the report itself could not be considered, Butler's corresponding testimony independently provided evidence that (1) respondent was attending therapy but not progressing; (2) respondent refused to participate in certain services; and (3) respondent refused to answer questions about substance use.

¶ 77    Moreover, separate from any reference to the report, Butler testified that respondent avoided talking to her, asked her to leave within minutes of home visits, and had taken twenty minutes to answer the door at the most recent home visit. Indeed, Butler indicated she had to seek updates about A.U. from his pediatrician because it was "difficult to talk to [respondent] regarding services for the minor."

¶ 78    In her brief, respondent acknowledges the evidence showed "she is difficult for the caseworker to reach, and reluctant to fully participate in the DCFS process" but suggests this was not enough to remove A.U. Respondent emphasizes Butler's testimony that she found the home to be safe and appropriate and that there were no reported incidents of harm to A.U.

¶ 79    However, the court does not need to wait until a child gets hurt before taking action. See, e.g., *In re K.F.*, 2023 IL App (1st) 220816, ¶¶ 48-49 (evidence of parent's drug use supported

finding of injurious environment even without showing that child had been harmed, as "courts need not wait for a child to get hurt."); *In re Jordyn L.,* 2016 IL App (1st) 150956, ¶ 35 (after a finding of an injurious environment or substantial risk of harm, "the trial court need not wait until the child becomes a victim or is permanently emotionally damaged to remove her").

¶ 80    Moreover, "[o]ur court has affirmed dispositions adjudging children wards of court where parents have completed some, but not all recommended services." *In re Chelsea H*., 2016 IL App (1st) 150560, ¶ 90 (affirming disposition order based on respondent's failure to complete recommended services, including a nurturing parenting program); *In re Kamesha J*., 364 Ill. App. 3d 785, 795-96 (2006) (affirming disposition order where respondent completed some services and was making progress in therapy "but needed more counseling"); *In re April C.,* 326 Ill. App. 3d 245, 258 (2001) (affirming disposition order where "respondent's participation in the recommended services was often less than satisfactory" and "not all of the recommended services were completed."). The fact that a respondent has completed some recommended services "does not mean that a disposition other than the one entered by the trial court would be in the best interests of the children." *In re Kamesha J*., 364 Ill. App. 3d at 796. In this case, it is not disputed that respondent not only failed to complete all services, but refused to participate in certain services and avoided speaking to her DCFS caseworker.

¶ 81    While acknowledging her failure to cooperate with certain services, respondent goes so far as to suggest the circuit court's dispositional decision was "intended to punish [respondent] for her recalcitrance, rather than being rooted in concern for A.U.'s best interests." We disagree. As the trial court reiterated, the December 2022 order permitted A.U. to remain with respondent subject to numerous conditions under the order of protection, which included cooperation with DCFS and participation in recommended services. Butler's testimony made clear that respondent actively

avoided her DCFS caseworker and failed to complete some services. Certainly, it was within the province of the court to take into account respondent's ability and willingness to comply with the conditions of the December 2022 order or protection, in the course of deciding whether she was able and willing to properly care for A.U. That is, the court could reasonably find that respondent's lack of cooperation was relevant to its ultimate determination of whether remaining in the home was in A.U.s' best interests. Indeed, the court's remarks that it "struggle[ed] with" the decision but could not "in good conscience" leave A.U. in the home indicated that the court did, in fact, exercise its discretion to enter a dispositional order based on what it believed was best for A.U.

¶ 82    We recognize that not all of the evidence was adverse to respondent. Nevertheless, we cannot say the "opposite conclusion was clearly evident" or that the court's findings regarding her ability to care for A.U. were unreasonable, arbitrary, or not based on the evidence presented. See *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 54. That is, the findings were not against the manifest weight of the evidence.

¶ 83    Nor can we say the trial court abused its discretion in adjudging A.U. a ward of the court. In this regard, we note respondent's claim that the trial judge "ignored" its alternative option to enter an order of disposition providing for monitoring of A.U. without removing him from the home. See 705 ILCS 405/2-23(2) (West 2022)) ("Any order of disposition may provide for protective supervision under Section 2-24 and may include an order of protection under Section 2-25.); *id*. § 2-24 (an order of protective supervision may place the person having custody "under supervision of the probation office" or "may require the parent to present the child for periodic medical examinations"); *id*. § 2-25(1) ("The court may make an order of protection in assistance of or as a condition of any other order authored by this Act.).

¶ 84    Respondent appears to suggest the trial court abused its discretion in not allowing A.U. to stay home, subject to setting additional conditions. However, as the trial court emphasized at the dispositional hearing, respondent had *already* been subject to conditions under the order of protection entered December 2022, but violated certain conditions and actively avoided her child's DCFS caseworker. Under these circumstances, the trial court could reasonably conclude that imposing more conditions would be ineffective and inadequate.

¶ 85                                    CONCLUSION

¶ 86    For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 87    Affirmed.