2026 IL App (1st) 250872

No. 1-25-0872

Opinion filed April 21, 2026

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
|   v. | ) | No. 24 JA 865 |
| | ) | |
| M.W., | ) | Honorable |
| | ) | Jennifer Payne, |
|     Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justices McBride and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Following an adjudication hearing, the trial court found that respondent M.W. neglected

his son, K.W., due to lack of care and an injurious environment. Following a disposition hearing,

the court found respondent M.W. unable to care for K.W., adjudged the minor a ward of the court,

and entered a permanency goal of returning home within 12 months. Respondent M.W. contends

the trial court's adjudication and disposition rulings were against the manifest weight of the

evidence. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     K.W. was born on December 28, 2014, to respondent M.W. and K.F. He is currently 11 years old. At all relevant times, respondent M.W. was K.W.'s sole custodial parent. The mother was a party to proceedings in the trial court but is not a party to this appeal.

¶ 4     On November 21, 2024, the State filed a petition for adjudication of wardship. The State alleged that respondent M.W. neglected K.W. under section 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-3(1)(a), (b) (West 2024)) because he did not provide K.W. with adequate care and exposed him to an injurious environment. The State also alleged that respondent M.W. abused K.W. under section 2-3(2)(ii) and (v) (*id.* § 2-3(2)(ii), (v)) by creating a substantial risk of physical injury and inflicting excessive corporal punishment. The State alleged that on September 25, 2024, K.W. "was observed to have a bruise on his hand and a facial injury." K.W. reported that respondent M.W. caused those injuries. Respondent M.W. "refused to seek timely medical attention for K.W." In addition, staff at K.W.'s school reported that he required clinical testing due to his aggressive behavior but that respondent M.W. refused to facilitate such testing and did not cooperate with Department of Children and Family Services (DCFS) personnel. Respondent M.W. also had two prior indicated reports of "cuts, bruises, welts, abrasions, oral injuries, and bone fractures."

¶ 5     Following a hearing that respondent M.W. did not attend, the trial court granted the DCFS guardianship administrator temporary custody of K.W. On November 25, 2024, respondent M.W. moved for a rehearing, explaining that he was not aware of the temporary custody hearing because he had been "experiencing difficulties with [his] phone." The trial court granted his motion and

held a new temporary custody hearing on December 3, 2024. The court again granted the DCFS guardianship administrator temporary custody.

¶ 6                                    A. Adjudication Hearing

¶ 7                                    1. Doctor Lakita Reed

¶ 8     Dr. Lakita Reed testified that she taught special education and English as a second language at Gillespie Elementary School (Gillespie Elementary) from August 2024 to January 2025. K.W. started at Gillespie Elementary in second grade but left early in the school year and was homeschooled thereafter. He reenrolled at Gillespie Elementary in August 2024 to begin fourth grade. Reed began working at Gillespie Elementary at approximately the same time and interacted with K.W. daily while supervising his class during breakfast and recess.

¶ 9     On September 11, 2024, Reed attended a virtual meeting with respondent M.W., the principal, K.W.'s classroom teacher, and a school case manager. K.W.'s teacher and the principal arranged the meeting to discuss K.W.'s behavioral issues, which included banging his head against his desk and walls, swearing loudly, talking to himself, pretending to be different people, and talking in the third person. K.W. also hit other students, got into fights, and threatened to "rape" another student's sister. Reed recommended a clinical evaluation of K.W., but respondent M.W. refused. He acknowledged that K.W.'s "social skills were lacking" but believed that was because of homeschooling. Respondent M.W. expressed no concern about K.W.'s self-harming behaviors. However, he did agree to a safety plan under which he would pick K.W. up from the school office at the end of the school day.

¶ 10    At approximately 8:10 a.m. on September 25, 2024, Reed noticed that K.W. had a black eye. K.W. did not have a black eye when Reed saw him the day before. Reed asked K.W. how that

injury happened, and K.W. said respondent M.W. hit him. K.W. added that, "when his dad drinks, he gets mad [and] he has veins that pop out at the beginning—at the top of his head that get really big. And when he gets real mad, he hits [K.W.], and he hit [K.W.] in the eye." The next day, September 26, 2024, K.W. got into a fight with a group of students during recess.

¶ 11    On November 7, 2024, Reed met with respondent M.W. because he wanted the school to advance K.W. from fourth grade to eighth grade. The assistant principal, K.W.'s classroom teacher, the school case manager, a social worker, and a psychologist also attended the meeting. Respondent M.W. believed that K.W.'s behavior was due to a lack of academic challenges and claimed that K.W. had memorized the entire dictionary. Reed explained that K.W. was not socially mature enough for eighth grade and again recommended that he undergo a clinical assessment for his behavioral issues. Respondent M.W. again refused.

¶ 12    On November 18, 2024, Reed asked K.W. to remove his gloves and put them in his locker before going to class. K.W. initially refused, then removed his gloves and quickly put his hands in his pockets. Reed saw that one of his hands was "black" and "bruised up, like a dark purple." Reed asked K.W. why his hand was black, and he said, "[Y]ou're trying to take me away from my dad. I can't tell you anything. I don't want to talk to you."

¶ 13                          2. Ayleene Woodard

¶ 14    DCFS investigator Ayleene Woodard testified she interviewed K.W. at his school on September 25, 2024. Woodard explained to K.W. that she worked for DCFS and "had some allegations of abuse to him and just wanted to make sure that he was safe in his home." K.W. responded, "DCFS? You take people's kids away." Before Woodard could ask a question, K.W. said, "No, my dad doesn't hit me. He never hits me." Woodard observed "a scratch or an abrasion

to the outside of the [right] eye, toward the cheek bone," "injuries to the inside of his arm," "scratches on the outside of his arm," and "bruising to his thigh." However, K.W.'s injuries "did not look like they just happened." K.W. acknowledged that he previously told his teacher and the assistant principal that respondent M.W. caused those injuries but told Woodard "he lied about it" and denied that respondent M.W. hit him. K.W. told Woodard that a classmate caused the injuries.

¶ 15    Woodard interviewed respondent M.W. the same day. She asked him how K.W. suffered a black eye, and respondent M.W. said "[h]e never hits his son in the eye." Woodard asked respondent M.W. to seek medical treatment for K.W.'s black eye. Respondent M.W. refused, explaining "that he did not have any money to take [K.W.] to the doctor." Respondent M.W. also claimed that K.W. "had been to two doctors, an ER and medical doctor early on in the month of September," although he did not explain the reasons for those visits. Woodard also asked respondent M.W. about an injury to the back of K.W.'s hand. Respondent M.W. said that K.W. "did that with a TikTok challenge" involving ice and claimed that K.W's injuries were due to him "being assaulted by the kids at school." During this meeting, respondent M.W. expressed his belief that the school was not adequately challenging K.W. and was retaliating against respondent M.W. for raising that concern. As of the following day, September 26, 2024, DCFS assessed K.W. to be safe in respondent M.W.'s custody.

¶ 16    On October 8, 2024, respondent M.W. called Woodard and reported that K.W. suffered injuries from another student hitting him. Respondent M.W. claimed that K.W.'s teacher ignored other students hitting him; he also made a vague reference to "metal bats" at the school.

¶ 17    Woodard interviewed K.W. again on November 13, 2024. K.W. stated that he felt safe at home and that he and respondent M.W. "practice[d] fractions and reading and math" together.

¶ 18     On November 18, 2024, Woodard investigated an allegation that K.W. attempted to hide an injury to his hand by wearing gloves and putting his hands in his pockets. Woodard interviewed K.W. that day and saw a new injury with "little purple spotting" on the back of his hand. An older hand injury from September was in the same location but "was kind of grayish." K.W. explained that he wore gloves because "he wanted to look cool" and denied that respondent M.W. hit him. Woodard did not ask K.W. what caused the hand injury because his body language suggested he did not want to talk to her. Woodard also attempted to interview respondent M.W. that day, but he refused. DCFS indicated the November 18, 2024, allegation under the category of "cuts, welts, bruises, abrasions, and oral injuries."

¶ 19                                3. Halema Townsend

¶ 20     DCFS public service administrator Halema Townsend testified that she was Woodard's supervisor. In September 2024, Townsend advised respondent M.W. to seek medical treatment for K.W.'s black eye. Respondent M.W. said that K.W. "went to the doctor twice in September already," but he refused to provide Townsend with proof of those visits. Respondent M.W. denied that he caused K.W.'s black eye and claimed that K.W. suffered that injury during a fight at school.

¶ 21     In September or October 2024, Townsend recommended intact family services to respondent M.W., but he refused to participate. He said he was consulting with an attorney but did not provide the attorney's contact information. Respondent M.W. refused to speak with DCFS personnel.

¶ 22     During an October 31, 2024, follow-up about seeking treatment for K.W.'s black eye, respondent M.W. told Townsend he lacked health insurance. At Townsend's recommendation, respondent M.W. called 911 and took K.W. to the hospital that day.

¶ 23                                    4. Respondent M.W.

¶ 24    Respondent M.W. testified that he had been K.W.'s sole caretaker for approximately five years. K.W. was 10 years old at the time of the adjudication hearing.

¶ 25    Respondent M.W. testified to a 2021 DCFS investigation regarding a scratch on K.W.'s arm. During that investigation, respondent M.W. admitted that he spanked K.W. as punishment. A DCFS investigator explained to respondent M.W. why corporal punishment was inappropriate, and he stopped using corporal punishment thereafter. Instead, he disciplined K.W. by taking away privileges like video games and his allowance. Respondent M.W. discussed the 2021 DCFS investigation with K.W. to "prepare him [for] the things that could happen," including the "possibility of him being removed from the home."

¶ 26    In September 2024, respondent M.W. noticed a "burn-like injury" on the back of K.W.'s hand. K.W. told respondent M.W. he suffered that injury in August or September 2024 while doing a "[s]alt and ice" TikTok challenge. Respondent M.W. put antibiotic ointment on K.W.'s hand injury and explained that he should not imitate behavior he sees on social media. At some point before October 15, 2024, respondent M.W. took K.W. to a pediatrician for treatment of his hand injury.

¶ 27    Multiple times in the fall of 2024, K.W. suffered injuries at school due to bullying. Respondent M.W. testified that K.W. "got jumped on by 15 students, and then again by two other students." Respondent M.W. addressed these incidents with school staff during the September 11, 2024, meeting. School staff recommended that K.W. undergo a clinical assessment. Respondent M.W. refused because he believed that K.W.'s behavior was not the problem; rather, "[t]he problem was that [he] was being bullied at school." Respondent M.W. denied that he caused the

black eye K.W. suffered in late September 2024. Respondent M.W. claimed that one of K.W.'s classmates caused that injury.

¶ 28                                    5. Exhibits

¶ 29    Relevant here, the State moved into evidence (1) a summary of indicated DCFS reports against respondent M.W., (2) photographs of K.W. on September 25, 2024, (3) K.W.'s medical records, and (4) K.W.'s school records.

¶ 30                                a. DCFS Records

¶ 31    DCFS records indicate that on October 7, 2021, when K.W. was six years old, school staff observed a bleeding wound on his left arm. K.W. initially said the wound was from playing basketball but then said "it was a secret but his father caused the injury when he was giving [K.W.] a who[o]ping." DCFS indicated this allegation of abuse against respondent M.W.

¶ 32                                b. Photographs

¶ 33    Photographs of K.W. that Woodard took on September 25, 2024, depict dark bruising surrounding K.W.'s right eye, a smaller bruise on the outside corner of his left eye, a pink circular abrasion on his right kneecap, faint spotting on the back of his right hand, and marks on the inside and outside of his left forearm.

¶ 34                                c. Medical Records

¶ 35    University of Chicago Medical Center records indicate that K.W. underwent a DCFS medical evaluation at Comer Children's Hospital on October 31, 2024. K.W. reported "being bullied at school and getting in fights" but felt safe at home. The examining physician found no injuries or signs of abuse. A social worker documented that respondent M.W. denied physically abusing K.W. and claimed that one of K.W.'s classmates hit him in the eye on September 6, 2024.

K.W. confirmed being bullied by that student. The social worker also documented that Townsend reported that K.W. had "a h[istory] of physical injuries allegedly caused by [respondent M.W.]" and told one of his classmates, "I will F*** you until you bleed." K.W. was discharged to respondent M.W.'s care the same day. Hospital staff attempted to follow up with respondent M.W. on November 13, 2024, but he did not answer his phone and had no voicemail available.

¶ 36                                    d. School Records

¶ 37    Gillespie Elementary records include a summary of the September 11, 2024, meeting between respondent M.W., Reed, and school staff. This summary reflects multiple instances of K.W.'s misbehavior, including telling another student "he would rape" them, kicking another student, banging his head against his desk, and telling other students he wanted to fight them. The summary also reflects that respondent M.W. denied K.W. would instigate fights but acknowledged he could be "vindictive" and that his social skills were "lacking." A grade level diagnostic dated September 11, 2024, reflects that K.W. was below grade level in both math and reading.

¶ 38    Gillespie Elementary disciplinary records reflect that K.W. received detention for fighting on September 25, 2024. The following day, September 26, a group of students "jumped" him on the playground until school staff intervened. Staff treated K.W.'s injuries with an ice pack. On October 2, Reed took away chips K.W. was eating in the hallway. K.W. yelled, "[Y]ou are a stupid b***," then told another student, "I will f*** you up" and "started to swing" until Reed pulled him away. K.W. again received detention for fighting on October 16. On November 20, K.W. told a kindergartener "that he wanted to enter [him or her] anally just like Diddy with a lot of baby oil." When school staff tried to report this incident to respondent M.W., his voicemail was full.

¶ 39 School records also include e-mail correspondence between respondent M.W. and K.W.'s fourth grade teacher Ricarda Sanders during the fall of 2024. On September 13, respondent M.W. asked Sanders about an incident in which one of K.W.'s classmates punched him in the eye during recess. Sanders stated she was absent that day and was unaware of the incident. On October 7, 25, 28, 29, and 30, Sanders reported that K.W. was disruptive in class. During the October 7 incident, K.W. told another student, "I will whoop your a***." On October 30, respondent M.W. requested that Sanders give K.W. more challenging homework and schoolwork. On November 1, respondent M.W. asked Sanders about multiple students assaulting K.W. that morning and requested that she keep students who wanted to harm K.W. away from him. On November 7, respondent M.W. told Sanders that K.W. would be absent because he had a bloody nose. K.W. returned to school the next day, and respondent M.W. stated that K.W. had a pediatrician appointment scheduled for November 19. On November 13, Sanders e-mailed respondent M.W. about K.W.'s constant coughing and runny nose, which was disrupting class. On November 20, respondent M.W. said that K.W. saw a pediatrician four days prior and was taking a nasal spray. Respondent M.W. also asked Sanders to return K.W.'s graded assignments so respondent M.W. could review them with K.W.

¶ 40                                  6. Adjudication Ruling

¶ 41 On May 5, 2025, the court found that K.W. was neglected due to a lack of care and an injurious environment under section 2-3(1)(a) and (b) of the Act respectively. The court found Reed and Woodard "very credible" and "sincere," while it found respondent M.W. less credible, particularly in denying that he struck K.W. The court reasoned that K.W.'s outcry that respondent M.W. hit him in the eye while intoxicated was the only plausible explanation for how K.W. arrived

at school with a black eye on the morning of September 25, 2024, when he did not have a black eye at school the day before. The court acknowledged that K.W. "changed his story" about whether respondent M.W. hit him but explained that "a child can be hit excessively by a parent and still love the parent."

¶ 42    In addition, the court found that K.W. had "very serious behavior and potential serious mental health issues." In particular, the threats of sexual assault he made to classmates were "pretty shocking statements coming from a nine-year-old." Based on those threats and K.W.'s self-harm, respondent M.W. should be "open to [K.W.] getting some help." The court reasoned that, even if K.W. did not need to be assessed for an individualized education program (IEP), he likely required mental health treatment, which respondent M.W. was responsible for facilitating.

¶ 43    Finally, the court found the evidence did not establish that respondent M.W. abused K.W. by creating "a substantial risk of physical injury *** by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." See *id.* § 2-3(2)(ii). The court explained that K.W.'s mental health issues may be independent of "any sort of abuse or neglect that caused the injury to his hand or his eye." The State withdrew the allegations of excessive corporal punishment. See *id.* § 2-3(2)(v).

¶ 44                                B. Disposition Hearing

¶ 45    The court immediately proceeded to a disposition hearing and took judicial notice of its adjudication findings.

¶ 46                                1. Eduardo Alvarado

¶ 47    DCFS child welfare specialist Eduardo Alvarado testified that he was assigned to this case on December 12, 2024. The following day, K.W. began a partial hospitalization program but

"caused an incident at the program where he was then recommended to be an inpatient. He was discharged from the hospital on January 9, 2025." During that hospitalization, K.W. was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and disruptive mood dysregulation disorder (DMDD). K.W. was hospitalized again from February 11, 2025, to March 14, 2025, and was diagnosed with only DMDD. K.W. was prescribed divalproex sodium and ziprasidone. He was "engaged in psychiatry and medical monitoring for his prescriptions" and was on a waitlist for therapy through Chatham Family Counseling. DCFS had issued referrals for therapy, but K.W. had not been able to attend therapy due to his "repeated moves and hospitalizations." K.W.'s medical care was otherwise up to date, although he needed to see a dentist and likely required eyeglasses.

¶ 48    When DCFS initially took custody of K.W. in November 2024, it placed him with foster mother E.G. He remained in that foster placement until his second discharge from the hospital on March 14, 2025. DCFS then placed him with foster mother B.B. until she had a medical emergency and could no longer care for K.W. On April 3, 2025, DCFS returned K.W. to foster care with E.G. Alvarado visited the foster home and found it safe and appropriate, with no signs of abuse, neglect, corporal punishment, or risk of harm to K.W., who had become attached to E.G. and referred to her as "grandma." Alvarado was confident that E.G. would seek appropriate medical care for any mental health issues K.W. might have.

¶ 49    K.W. was in fourth grade at Aldridge Elementary. He did not have an IEP, but the school was preparing an IEP case study. K.W. had several unusual incident reports during the month before the disposition hearing. On April 1, 2025, the school suspended him for bringing a metal rod as "self-defense," supposedly in response to a classmate's threats. School staff determined that

no such threats occurred. On May 1, 2025, the Screening Assessment and Support Services program evaluated K.W. based on his "acting out" in school and recommended a partial hospitalization program. The following day, K.W. punched and broke a window at school. Screening Assessment and Support Services evaluated K.W. at his foster home and again recommended a partial hospitalization program. As of May 5, 2025, K.W. was on a waitlist for a partial hospitalization program at Garfield Park Hospital.

¶ 50    Beginning in January 2025, respondent M.W. attended weekly individualized therapy through Catholic Charities. He completed parenting training classes through Ada S. McKinley Community Services on April 2, 2025. DCFS recommended that respondent M.W. undergo a substance abuse assessment because, during the integrated assessment, he reported that he had "used multiple substances in the past." He stopped using substances in the 1990s and attended a rehabilitation program, Alcoholics Anonymous, and Narcotics Anonymous. However, he reported that he no longer participated in those programs and drank "occasionally throughout the week," including "in the presence of [K.W.] while acting as the sole caregiver." Respondent M.W. admitted that, on one occasion, he was under the influence when he drove K.W. to seek emergency treatment for stomach issues. A police officer stopped respondent M.W. for speeding but allowed him to proceed "without questioning sobriety." Respondent M.W. refused to undergo a substance abuse assessment because the allegations that gave rise to this case did not involve substance abuse.

¶ 51    Respondent M.W. attended weekly supervised visits with K.W. at a DCFS field office in Harvey. Alvarado observed those visits and found that K.W. responded well to them. K.W. had "a strong and loving relationship" with respondent M.W. and was "always very excited to meet with"

him. Alvarado had no concerns regarding intoxication or inappropriate behavior by respondent M.W. during visits.

¶ 52    Alvarado recommended that K.W. be adjudged a ward of the court "[d]ue to prior involvement of DCFS with the family, as well as reports of [respondent M.W.] having refused treatments and services for his son prior to DCFS involvement." Alvarado also recommended a permanency goal of returning home within 12 months.

¶ 53                                    2. Respondent M.W.

¶ 54    Respondent M.W. testified that he spoke to K.W. by phone twice daily for approximately 30 to 60 minutes. K.W. enjoyed those phone calls, wanted to see respondent M.W. more often, and frequently asked when he would return home. If the court returned K.W. to respondent M.W.'s custody, respondent M.W. would take K.W. to his partial hospitalization program, ensure that he continued his medication regimen, take him to therapy appointments, and consult with doctors regarding his condition and treatment. Respondent M.W. also testified that he would undergo a substance abuse assessment if the court ordered one.

¶ 55                                    3. Exhibits

¶ 56    The State moved into evidence (1) a December 30, 2024, DCFS family service plan, (2) a February 4, 2025, DCFS integrated assessment, and (3) a May 2, 2025, permanency hearing report.

¶ 57    The family service plan, which Alvarado drafted, was consistent with his testimony.

¶ 58    Relevant here, the integrated assessment documented Alvarado's interview of respondent M.W. on January 2, 2025. Respondent M.W. stated that he abused substances including alcohol, cocaine, and heroin from his childhood until the age of 26. In December 1990, he entered rehabilitation. Respondent M.W. was sober thereafter but began drinking wine approximately four

or five years before the interview, when he retired from his job. He "drank a forty-ounce of beer or half of a bottle of wine two to three days per week," usually in the afternoon but occasionally in the morning. Respondent M.W. acknowledged drinking in K.W.'s presence. K.W. did not like when respondent M.W. drank because respondent M.W. made K.W. do his homework so respondent M.W. could drink and fall asleep. K.W. asked respondent M.W. if he had been drinking by saying, "Have you been to the store today?" Respondent M.W. "reported that on one occasion, he had had a few alcoholic drinks, and [K.W.] reported that he felt sick." Respondent M.W. "transported [K.W.] to Comer Children's Hospital's Emergency Department and on the way there, was stopped by police for speeding." Respondent M.W. claimed that he "did not receive a ticket and the officer did not question his sobriety." Respondent M.W. acknowledged that "it was a poor decision to get in the car and transport [K.W.] anywhere while under the influence." DCFS recommended a substance abuse assessment including "[r]andomly scheduled urine toxicology screens."

¶ 59    The permanency hearing report noted that respondent M.W. canceled a therapy session on April 28, 2025, because he "appeared to be under the influence of alcohol at the start of the session." Respondent M.W. self-reported this incident by telephone, and "during the time of the call [his] speech was slurred and at times rambled." Respondent M.W. refused to undergo a substance abuse assessment. The permanency hearing report recommended a goal of returning home by May 31, 2026.

¶ 60                                4. Disposition Ruling

¶ 61    The court found that respondent M.W. was unable for reasons other than financial circumstances alone to care for, protect, train, or discipline K.W. and adjudged K.W. a ward of the

court. The court explained that respondent M.W. demonstrated willingness to care for K.W. by engaging in therapy and parent education. However, respondent M.W. still needed to undergo a substance abuse assessment due to his admission of prior substance abuse and K.W.'s statements that respondent M.W. hit K.W. when he drank. The court increased supervised visitation to a minimum of twice per week, required respondent M.W. to undergo a substance abuse assessment before allowing unsupervised visitation, and entered a permanency goal of returning home within 12 months.

¶ 62    Respondent M.W. timely appealed.

¶ 63                                II. ANALYSIS

¶ 64    Respondent M.W. contends the trial court's adjudication and disposition rulings were against the manifest weight of the evidence.

¶ 65    The Act establishes procedures and criteria for determining whether to remove a minor from his parent's custody and whether to make that minor a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The trial court uses a two-step process to make those decisions. *In re A.P.*, 2012 IL 113875, ¶ 18. First, the court holds an adjudication hearing to determine whether the minor is abused, neglected, or dependent. *Id.* ¶ 19; 705 ILCS 405/2-21(1) (West 2024). If the court finds that the minor is abused, neglected, or dependent, it holds a disposition hearing to determine whether it is in the minor's and the public's best interest for the minor to become a ward of the court. *A.P.*, 2012 IL 113875, ¶ 21; 705 ILCS 405/2-21(2) (West 2024). A disposition order is a final and appealable order. *In re Jaron Z.*, 348 Ill. App. 3d 239, 253 (2004) (citing *In re M.J.*, 314 Ill. App. 3d 649, 654-55 (2000)).

¶ 66                          A. Adjudication Ruling

¶ 67    Respondent M.W. contends the trial court's findings of neglect due to a lack of care and an injurious environment were against the manifest weight of the evidence.

¶ 68    At an adjudication hearing, the trial court determines whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2024). The trial court considers the minor's status at the time the State filed its petition. *In re Kenneth D.*, 364 Ill. App. 3d 797, 804 (2006). Neglect means "the failure to exercise the care that circumstances justly demand, and encompasses both willful and unintentional disregard of parental duty." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28. The State must prove neglect by a preponderance of the evidence, meaning that the allegations of neglect are more probably true than untrue. *Arthur H.*, 212 Ill. 2d at 463-64. Courts must decide each case of neglect based on its unique facts. *Id.* at 463.

¶ 69    A neglected minor includes one "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for the minor's well-being, including adequate food, clothing, and shelter." 705 ILCS 405/2-3(1)(a) (West 2024). A neglected minor also includes one "whose environment is injurious to the minor's welfare." *Id.* § 2-3(1)(b). An "injurious environment" is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his children." *In re Kamesha J.*, 364 Ill. App. 3d 785, 793 (2006).

¶ 70    We review the trial court's findings of neglect under the manifest weight of the evidence standard. *In re Alexis H.*, 401 Ill. App. 3d 543, 551 (2010). We defer to the trial court's findings because it is in a better position to observe the witnesses and evaluate their credibility. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 32. We will not disturb the trial court's findings unless the record

clearly demonstrates that the court should have reached the opposite conclusion or that the court's ruling is unreasonable, arbitrary, and not based on the evidence. *Id.* We can affirm the trial court's ruling on any of the bases of neglect it found. *In re Abel C.*, 2013 IL App (2d) 130263, ¶ 28 (citing *In re Faith B.*, 216 Ill. 2d 1, 14 (2005)).

¶ 71                                    1. Physical Injuries

¶ 72    A minor suffering nonaccidental physical injuries while in the respondent's care can establish an injurious environment even if it is not certain the respondent inflicted the injuries. *In re F.S.*, 347 Ill. App. 3d 55, 67 (2004); *In re Weber*, 181 Ill. App. 3d 702, 709 (1989); *In re Simmons*, 127 Ill. App. 3d 943, 949-50 (1984); *In re Gomez*, 53 Ill. App. 3d 353, 359 (1977).

¶ 73    The evidence established that K.W. suffered multiple visible injuries while in respondent M.W.'s care. Most significantly, K.W. suffered a black eye between attending school on September 24, 2024, and arriving at school the following morning on September 25, 2024. Respondent M.W. was K.W.'s only custodial parent at the time, so it is almost certain K.W. sustained that black eye while in respondent M.W.'s care. As the trial court correctly observed, the evidence offered no other explanation for when or how K.W. suffered that black eye. Photographs taken on September 25, 2024, confirm that K.W. had bruising around his right eye. Those photographs also depict apparent injuries to K.W.'s knee, arm, and right hand. K.W. again suffered a burn-like injury to the back of his hand in November 2024. Even if respondent M.W. did not directly cause these injuries, they supported the finding that K.W. was exposed to an injurious environment while in respondent M.W.'s custody. See *Gomez*, 53 Ill. App. 3d at 359 (minor was neglected due to an injurious environment where she repeatedly arrived to school with severe bruises).

¶ 74 Furthermore, the evidence indicated that respondent M.W. caused at least some of K.W.'s injuries. As early as October 2021, K.W. made an outcry that respondent M.W. injured his arm during a "who[o]ping." K.W. repeatedly used that word to describe physically harming someone, including the classmate he threatened on October 7, 2024. On September 25, 2024, K.W. told Reed that, when respondent M.W. drank, he became angry and hit K.W. in the eye. During that conversation, K.W. described how respondent M.W. had "veins that pop out" when he got mad. This evidence bolstered the trial court's finding that respondent M.W. subjected K.W. to an injurious environment.

¶ 75 Respondent M.W. argues that "K.W. was injured at school," not while he was in respondent M.W.'s care. How K.W. sustained the injuries he suffered in the fall of 2024 was a question of fact for the trial court to resolve. See *Zoey L.*, 2021 IL App (1st) 210063, ¶ 32. We do not reweigh the evidence or substitute our judgment for the trial court's on matters of credibility. *In re Jeh. R.*, 2023 IL App (1st) 230006, ¶ 59. We acknowledge there was evidence of K.W. being injured in fights at school, most notably on September 26, 2024, the day *after* he arrived at school with a black eye. But K.W. being injured at school did not negate the fact that he also suffered injuries while in respondent M.W.'s care. Therefore, the court's finding of neglect due to an injurious environment was not against the manifest weight of the evidence.

¶ 76                    2. Failure to Seek Physical and Mental Healthcare

¶ 77 A child who does not receive appropriate medical treatment is neglected due to both a lack of care and an injurious environment. *In re Adam B.*, 2016 IL App (1st) 152037, ¶¶ 38-40.

¶ 78 The evidence established that respondent M.W. did not seek timely or appropriate medical treatment for K.W.'s physical injuries. For example, respondent M.W. did not seek treatment for

K.W.'s black eye on September 25, 2024, even though Woodard and Townsend advised him to do so. It appears respondent M.W. believed that K.W. seeing doctors twice in early September 2024, *before* he suffered the black eye, somehow obviated the need for him to see a doctor *after* suffering the black eye. That is illogical. Respondent M.W. sought "treatment" for K.W.'s black eye more than a month later, on October 31, 2024, and only at Townsend's insistence. But by that point, K.W.'s black eye had faded, and medical staff could not examine it. That was not an adequate response to a child's head injury. In addition, respondent M.W. ignored hospital staff's attempt to follow up with him on November 13, 2024.

¶ 79 The evidence also showed that respondent M.W. refused to seek treatment for K.W.'s significant mental health needs. During the September 11, 2024, meeting, Gillespie Elementary staff told respondent M.W. that K.W. engaged in self-harm by banging his head against desks and walls and that he displayed alarming physical and verbal aggression toward other students. Respondent M.W. expressed no concern about these behaviors. He also ignored school staff's attempt to report K.W.'s November 20, 2024, threat to sexually assault a kindergartener "just like Diddy." Rather than taking K.W.'s disturbing behavior seriously, respondent M.W. dismissed it as a lack of social skills and blamed the school for not academically challenging K.W. Respondent M.W. also refused to allow a clinical evaluation of K.W., which school staff recommended at least twice. On the contrary, respondent M.W. insisted on advancing K.W. from fourth grade to eighth grade even though K.W. was already below grade level in math and reading. This demand demonstrated respondent M.W.'s unrealistic view of his son's development and his failure to take K.W.'s mental health issues seriously. As explained above, "[a] child who does not receive appropriate medical evaluations or care is neglected," and medical care includes mental health care

for a minor who displays aggressive behavior. *Id.* ¶ 38; *In re Diamond M.*, 2011 IL App (1st) 111184, ¶¶ 4, 32.

¶ 80     *Adam B.* guides our reasoning. In that case, the trial court found three brothers, Adam B., Joshua B., and Isaiah B., neglected due to lack of care and an injurious environment. *Adam B.*, 2016 IL App (1st) 152037, ¶¶ 3, 30. On appeal, the minors' mother challenged the findings of neglect as against the manifest weight of the evidence, and this court affirmed. *Id.* ¶ 1. We explained that Joshua B. was neglected due to a lack of care and an injurious environment because his mother did not follow up with mental health care for his aggression toward his siblings. *Id.* ¶¶ 38-40. We also reasoned that Isaiah B. was neglected due to lack of care and an injurious environment because his mother did not seek prompt medical treatment for a burn he suffered; rather, she took him to the hospital only after a daycare worker threatened to contact DCFS. *Id.* ¶¶ 42-44. *Adam B.* illustrates that a custodial parent's delay in seeking medical treatment for physical injuries and refusal to seek mental health care for a minor's aggressive behavior support findings of neglect based on both lack of care and an injurious environment. That is what happened in this case, so this case should have the same outcome as *Adam B.*: affirmance of the trial court's findings of neglect.

¶ 81     Respondent M.W. claims that he "regularly got K.W. medical care." That is an overstatement. Respondent M.W. *occasionally* sought medical care for K.W., but not in a timely fashion or for the reasons he most needed it. We reject respondent M.W.'s claim that the photographs depicting K.W. on September 25, 2024, show "a healthy boy, not in any active distress." The photographs show a boy with a prominent black eye and what appear to be injuries

to multiple limbs. K.W. was not "healthy." He was clearly physically injured even if he was not crying or showing signs of obvious distress in the photographs.

¶ 82    Additionally, respondent M.W. argues that he "regularly engaged with the school about how to handle problems with K.W. there." To some degree that is true, but respondent M.W.'s "engagement" with school staff was rarely, if ever, productive. None of respondent M.W.'s meetings with Gillespie Elementary staff resulted in him seeking timely physical or mental healthcare for K.W. Respondent M.W. remained dismissive of school staff's concerns about K.W.'s aggressive behavior, blaming the school for not challenging him academically even though he was already below grade level in math and reading. "Engagement" that results in no meaningful action does not constitute adequate childcare. Accordingly, the trial court's findings of neglect due to lack of care and an injurious environment were not against the manifest weight of the evidence.

¶ 83                                B. Disposition Ruling

¶ 84    Respondent M.W. also challenges the trial court's disposition ruling as against the manifest weight of the evidence.

¶ 85    The purpose of the disposition hearing is to determine whether it is in the best interest of the minor and the public for the minor to become a ward of the court. *A.P.*, 2012 IL 113875, ¶ 21; 705 ILCS 405/2-21(2) (West 2024). The trial court may make the minor a ward if it finds that the parent at issue is unable, unwilling, or unfit, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if she remains in her parent's custody. *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30; 705 ILCS 405/2-27(1) (West 2024). A finding on any one of the grounds is sufficient to make the minor a ward of the court. *Harriett L.-B.*, 2016 IL App (1st)

152034, ¶ 30. We will reverse the trial court's disposition ruling if its factual findings are against the manifest weight of the evidence or if the court abused its discretion by choosing an inappropriate disposition order. *Id.*

¶ 86 The trial court based its disposition ruling on respondent M.W.'s failure to complete a substance abuse assessment. That ruling was not against the manifest weight of the evidence. The facts regarding respondent M.W.'s substance abuse are undisputed. Respondent M.W. admitted having a history of substance abuse, including alcohol abuse, dating to his childhood. Although respondent M.W. underwent rehabilitation in 1990, he resumed drinking again in 2020 or 2021 and continued to drink throughout this case. Just one week before the disposition hearing, respondent M.W. missed a therapy session because he was intoxicated. This evidence showed that concerns regarding respondent M.W.'s alcohol use are well founded and are not limited to decades past, as he suggests on appeal.

¶ 87 There is also no question that respondent M.W.'s drinking negatively affected K.W. Respondent M.W. admitted that he drank when he was K.W.'s sole caregiver, both in the morning and the afternoon. Respondent M.W. knew that K.W. did not like him drinking, and it appears that respondent M.W. sometimes used drinking to avoid his caregiving responsibilities by ordering K.W. to do his homework so he could drink and fall asleep in peace. Most concerningly, respondent M.W. admitted that he drove K.W. to the hospital while intoxicated. The trial court requiring respondent M.W. to undergo a substance abuse assessment was entirely reasonable. Given K.W.'s significant healthcare needs, respondent M.W. must demonstrate that he can and will be sober whenever K.W. is in his care.

¶ 88    Respondent M.W. argues that he "completed all the services required of him, except one," presumably referring to the substance abuse assessment. That is true, and it supports affirmance, not reversal, of the disposition ruling. This " 'court has affirmed dispositions adjudging children wards of court where parents have completed some, but not all, recommended services.' " *In re A.U.*, 2024 IL App (1st) 231727, ¶ 79 (quoting *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 90).

¶ 89    Respondent M.W.'s justification for refusing the substance assessment, which is that substance abuse was not among the State's allegations in the petition that initiated this case, is unpersuasive. It is not respondent M.W.'s role to decide which services are necessary or which allegations the trial court can consider. That is the court's responsibility, and there is nothing improper with the court's consideration of "evidence of parental deficiencies in the child's environment beyond those alleged in the petition." See *In re M.D.*, 2022 IL App (4th) 210288, ¶ 65.

¶ 90    Respondent M.W. also contends that he sees "K.W. weekly in supervised visits." That is true, and it appears those visits are going well. However, successful supervised visits do not negate the need for a substance abuse assessment. Although respondent M.W. has been sober for his supervised visits with K.W., the court could reasonably conclude that respondent M.W. might drink during unsupervised visitation with or custody of K.W. In fact, respondent M.W. admitted having done exactly that in the past.

¶ 91    Finally, respondent M.W. argues that, "since K.W. was removed from the care of [respondent], he has done significantly worse," citing his continuing behavioral issues at school and mental health hospitalizations. We disagree. The fact that K.W. continues to have behavioral issues at school does not mean he is in a worse position in foster care than he was in respondent

M.W.'s custody. On the contrary, in foster care, K.W. is finally receiving the mental health care he requires, including inpatient hospitalization, partial hospitalization, and medication. Respondent M.W. refused to seek such treatment when he had custody of K.W. Accordingly, the trial court's disposition ruling was not against the manifest weight of the evidence.

¶ 92                                    III. CONCLUSION

¶ 93     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 94     Affirmed.

---

***In re K.W.*, 2026 IL App (1st) 250872**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 24-JA-865; the Hon. Jennifer Payne, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Rebecca A. Cohen, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Erin Hughes, of counsel), for other appellee. |